# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MISSOURI

## EASTERN DIVISION

ASARCO LLC,

      Plaintiff,

v.

NL INDUSTRIES, INC., *et al.*,

      Defendants.

Case No.: 4:11-cv-00864 JAR

## ASARCO LLC'S *LONE PINE* BRIEF ON CERCLA LIABILITY OF UNION PACIFIC RAILROAD COMPANY

TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

PRELIMINARY STATEMENT .............................................................................. 2

ANALYSIS ............................................................................................................. 4

I.     RELEVANT LEGAL STANDARDS .......................................................... 4

       A.  CERCLA Overview ........................................................................... 4

       B.  Elements of *Prima Facie* Liability ..................................................... 5

II.    UNION PACIFIC IS LIABLE AS A CURRENT OPERATOR OF RAIL LINES AT
       SEMO ................................................................................................... 7

III.   UNION PACIFIC IS LIABLE AS A FORMER OWNER AND OPERATOR OF
       RAIL LINES AT SEMO ....................................................................... 10

       A.  Union Pacific Is a Former Owner and Operator of Rail Lines Constructed
           With Toxic Mine Waste .................................................................. 11

       B.  Union Pacific Is Liable as a Successor to Past Rail Owners and Operators ........ 13

       C.  Union Pacific's Rail Lines Throughout SEMO Are "Facilities" Under
           CERCLA § 101(9) ......................................................................... 16

       D.  There Were Releases or Threats of Releases of Hazardous Substances from
           the Rail Lines ................................................................................ 18

       E.  Union Pacific's "Releases" Caused Asarco to Incur Response Costs ................. 21

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Cas.& Surety Co. Inc. v. Pintlar Corp.,*
  948 F.2d 1507 (9th Cir. 1991) ................................................................. 23

*Allen v. U.S. Bank, N.A. (In re Allen),*
  No. 1:03-bk-22525E, 2005 Bankr. LEXIS 3552, at *7-8 (Bankr. E.D. Ark. May 11, 2005) ..... 7

Am. Cyanamid Co. v. Capuano,
  381 F.3d 6 (1st Cir. 2004) ...................................................................... 23

*Amoco Oil Co. v. Borden, Inc.,*
  889 F.2d 664 (5th Cir. 1989) .................................................................. 21

*Anspec Co. v. Johnson Controls*, *Inc.,*
  922 F.2d 1240 (6th Cir. 1991) ............................................................. 5, 13

*B.F. Goodrich v. Betkoski,*
  99 F.3d 505 (2d Cir. 1996) .................................................................... 23

*B.F. Goodrich; United States v. Carolina Transformer Co.,*
  978 F.2d 832 (4th Cir. 1992) .................................................................. 13

*Boeing Co. v. Cascade Corp.,*
  920 F. Supp. 1121 (D. Or. 1996) ........................................................... 22

*Burlington N. & Santa Fe Ry. Co. v. United States,*
  556 U.S. 599 (2009) ............................................................................... 4

*Capreal, Inc. v. United States,*
  99 Fed. Cl. 133 (2011) .......................................................................... 16

*City of Ford v. United States,*
  106 Fed. Cl. 136 (Fed. Cl. 2012) ........................................................... 16

*Control Data Corp. v. S.C.S.C. Corp.,*
  53 F.3d 930 (8th Cir. 1995) ................................................................ 4, 6

*Cowden v. BNSF Ry. Co.,*
  No. 4:08CV01534 ERW, 2013 U.S. Dist. LEXIS 155486, at *20-22 (E.D. Mo. Oct. 30, 2013) 7

*Georgia-Pacific Consumer Products LP v. NCR Corp.*,
  2013 WL 5428729, \*6 (W.D. Mich. Sept. 26, 2013) .................................................. 6

*Idaho v. Hanna Mining Co.*,
  882 F.2d 392 (9th Cir. 1989) .................................................................................... 5

*Johnson v. James Langley Operating Co., Inc.*,
  226 F.3d 957 (8th Cir. 2000) .......................................................................... 6, 18, 21

*K.C.1986 Ltd. P'ship v. Reade Mfg.*,
  472 F.3d 1009 (8th Cir. 2007) ................................................................................ 14

*Kalamazoo River Study Group v. Menasha Corp.*,
  228 F.3d 648 (6th Cir. 2000) .................................................................................... 6

*Kamuck v. Shell Energy Holdings GP, LLC*,
  2012 U.S. Dist. LEXIS 125566, 2-3 (M.D. Pa. Sept. 5, 2012) .................................. 3

*Kelley v. Thomas Solvent Co.*,
  727 F. Supp. 1532 (W.D. Mich. 1989) ....................................................................... 5

*Lakeside Feeders Inc. v. Producers Livestock Mktg. Ass'n*,
  666 F.3d 1099, 1110 (8th Cir. Iowa 2012) ................................................................ 7

*Leo Sheep Co. v. United States*,
  440 U.S. 668 (1979) ................................................................................................ 15

*Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Trust*,
  32 F.3d 1364 (9th Cir. 1994) ................................................................................... 12

*Los Angeles v. San Pedro Boat Works*,
  2011 WL 855858, \*9 (9th Cir. Mar. 14, 2011) ........................................................... 7

*Louisiana-Pacific Corp. v. Asarco, Inc.*,
  909 F.2d 1260 (9th Cir. 1990) ................................................................................. 13

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
  596 F.3d 112 (2d Cir. 2010) ...................................................................................... 6

*Northern Pacific R. Co. v. Townsend*,
  190 U.S. 267 (1903) ................................................................................................ 15

*Redevelopment Agency v. BNSF Ry.*,
  643 F.3d 668 (9th Cir. 2011) ................................................................................... 10

*Samuel C. Johnson 1988 Trust v. Bayfield County,*
    649 F.3d 799 (7th Cir. 2011) ................................................................................. 15

*Schmidt v. City of Bella Villa,*
    557 F.3d 564 (8th Cir. Mo. 2009) ............................................................................ 7

*Smith Land & Improvement Corp. v. Celotex Corp.,*
    851 F.2d 86 (3d Cir. 1988) ...................................................................................... 13

*Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.,*
    320 F.3d 838 (8th Cir. Ark. 2003) .......................................................................... 7

*Tosco Corp. v. Koch Indus., Inc.,*
    216 F.3d 886 (10th Cir. 2000 ................................................................................. 6

*United States v. Alcan Aluminum Corp.,*
    990 F.2d 711 (2d Cir. 1993) ("Alcan II) ................................................................. 21

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ............................................................................................. 7, 12

*United States v. Big Horn,*
    17 F.2d 357 (8th Cir. 1927) .................................................................................... 15

*United States v. Cello-Foil Prods., Inc.,*
    100 F.3d 1227 (6th Cir. 1996) ............................................................................ 5, 16

*United States v. Hercules, Inc.,*
    247 F.3d 706 (8th Cir. 2001) .............................................................................. 6, 21

*United States v. Mexico Feed & Seed Co.,*
    980 F.2d 478 (8th Cir. 1992) ...................................................................... 11, 13, 14

*United States v. Ne. Pharmaceutical,*
    810 F.2d 726 (8th Cir. 1986) .................................................................................. 17

*United States v. R.W. Meyer, Inc.,*
    889 F.2d 1497 (6th Cir. 1989) ............................................................................. 5, 7

*United States v. Rohm & Haas,*
    939 F. Supp. 1142 (D.N.J. 1996) ........................................................................... 21

*United States v. TIC Inv. Corp.,*
    68 F.3d 1082 (8th Cir. 1995) .............................................................................. 7, 11

*United States v. Union Pacific R. Co.*,
   91 U.S. 72 (1875) .................................................................................... 15

*United States v. Vertac Chem. Corp.*,
   46 F.3d 803 (8th Cir. 1995) ............................................................... 11, 12

*United States v. Ward*,
   618 F. Supp. 884 (E.D.N.C. 1985) ........................................................... 17

**Statutes**

40 C.F.R. § 300.700(c)(3)(ii) ................................................................. 22

40 C.F.R. § 302.4 .................................................................................... 16

42 U.S.C. § 9601 ............................................................................... passim

42 U.S.C. § 9607 ............................................................................... passim

49 C.F.R. § 1152.29(e)(2) ....................................................................... 15

**Other Authorities**

Emergency Railroad Transporation Act of 1933 ....................................... 12

Transportation Act of 1920 ................................................................. 12, 15

## INTRODUCTION

The Southeast Missouri Superfund sites ("SEMO")[1] are contaminated with heavy metals, including lead, cadmium and zinc, resulting from two centuries of mining and railroad activities. These environmentally damaging activities include environmental impacts from Union Pacific Railroad Company's ("Union Pacific" or "the Railroad") use and abandonment of railroad lines that were constructed with toxic mining waste over vast areas of the SEMO sites.

This case stems from Asarco LLC's ("Asarco") voluntary payment of $79,513,163, plus interest to settle the government's joint environmental claim for funds necessary to cleanup all of SEMO sites.  Although Union Pacific caused pervasive pollution over many miles within two SEMO counties, unlike Asarco, the Railroad has paid nothing for the cleanup.  Consequently, Asarco filed this action seeking contribution pursuant to Section 113 of CERCLA.  Until Asarco filed this action, the public and, to some extent, regulators were unaware that Union Pacific's abandoned hazardous waste blankets vast areas across two counties in Southeast Missouri.

This Brief is filed in response to a court determination that the case should proceed first through a liability phase.  In particular, following an unsuccessful motion to dismiss, the Railroad persuaded the Court to stage this CERCLA litigation, putting off the damages or allocation phase until Asarco could demonstrate a *prima facie* case of CERCLA liability.  Thus, the Court issued what all parties are referring to as a "Lone Pine" order, together with various other clarifying orders, requiring Asarco to file this brief establishing CERCLA liability. Following initial discovery, all defendants other than Union Pacific stipulated that Asarco proved

---

[1]SEMO comprises several counties within Missouri, and encompasses five sub-sites: (1) Madison County / Catherine Mine ("Madison County"); (2) Big River / Federal Mine Tailings ("St. Francois County"); (3) West Fork Mine; (4) Sweetwater Mine; and (5) Glover Smelter, and all areas where hazardous substances from any of these areas have come to be located. Ex. C at 1.  The two sub-sites that are the focus of the present litigation are Madison County and St. Francois County, which are both in areas of southeast Missouri known as the "Old Lead Belt."  Ex. D at 1; Ex. E at 1.  The Old Lead Belt is located approximately 70 miles south of St. Louis.  *Id*.

1

its case of CERCLA *prima facie* liability as required at this stage of the litigation in this case. Union Pacific chose to challenge Asarco at the liability phase of this case.

Despite the Railroad's stubborn resistance to discovery efforts, Asarco obtained from Union Pacific, crystal clear evidence that it abandoned mining waste in large areas of SEMO, that that mining waste contains high levels of lead, that mining waste is leaching lead into the environment, and that the locations where the Railroad abandoned its waste – next to waterways, wetlands and rivers – are all areas within SEMO that Asarco paid to cleanup.

## PRELIMINARY STATEMENT

For over 150 years, defendant Union Pacific Railroad Company or its predecessors owned and operated rail lines throughout St. Francois and Madison Counties within SEMO to haul ore, ore concentrate, and other materials to and from mining sites.  We demonstrate here that Union Pacific's historical and current operations have resulted in the release of significant quantities of lead and other heavy metals harmful to human health and the environment.  This harm spreads over hundreds of miles of rail lines and rights-of-way in SEMO that Union Pacific purchased, owned or controlled.  These Railroad's releases have occurred from spills during the transportation of mining materials and as a result of the historical use of mine waste to construct rail beds, grade rail lines, and fill embankments.  Metals from this mine waste, which consisted primarily of "chat", a fine grain gravel containing hazardous substances including lead, cadmium, and zinc, have spread over time through erosion and leaching into large land areas and nearby waterways.

The U.S. Environmental Protection Agency ("EPA") and the State of Missouri have targeted lead, cadmium, and zinc in the on-going cleanup of SEMO.  Through its settlement with the United States and State of Missouri and payment of $79,513,163, plus interest, Asarco contributed to the remediation of each of the five SEMO sites, including cleaning up the metals

2

contamination that resulted from Union Pacific's activities in St. Francois and Madison Counties.[2]  As stated, Union Pacific paid nothing to regulators, and now, to the party that has paid to address its industrial mess – Asarco.  Asarco is entitled to contribution from Union Pacific for an appropriate share of the cleanup costs attributable to Union Pacific's abandoned contamination.  Ex. C at 3-6.

Asarco brought this action under section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et. seq*., for reimbursement of its response costs from other parties which are liable under CERCLA for the metals contamination of SEMO.  All of the defendants except Union Pacific stipulated to elements of CERCLA liability for purposes of a *Lone Pine* showing.  Doc. Nos. 190, 192 and 193.  Consequently, in accordance with the Court's March 11, 2013, Memorandum and Order (Doc. 141 at 6-7), June 21, 2013, Modified Case Management Order (Doc. 147 at 5), and November 19, 2014, Memorandum and Order (Doc. No. 189 at 1), Asarco files this *Lone Pine* Response[3] ("Response") to address the *prima facie* CERCLA liability of the Railroad.

As demonstrated by this Response, documentary evidence, field testing results, and testimony, including the Declaration of Paul V. Rosasco, P.E. (Ex. B) and his Expert Report, (Ex. F), Asarco has established Union Pacific's *prima facie* liability under CERCLA.  The evidence shows that the Railroad and its predecessor companies permitted on-going uncontrolled releases of cadmium, lead, and zinc into soils, surface water, and sediment at SEMO.  The scope

---

[2] Asarco has also paid over $29 million for natural resource damages at Madison and St. Francois Counties.  Ex. C at 4-6.

[3] Despite this filing's designation as a *Lone Pine* Response, this response is not a typical *Lone Pine* response related to a toxic tort case.  In the context of mass tort litigation, courts have used *Lone Pine* pre-discovery orders in order to handle complex issues and potential burdens on defendants and the court.  *Kamuck v. Shell Energy Holdings GP, LLC*, 2012 U.S. Dist. LEXIS 125566, 2-3 (M.D. Pa. Sept. 5, 2012).  In this action, the Court has clarified that Asarco is expected to establish a *prima facie* case on its contribution claim under CERCLA § 113(f) rather than establish traditional toxic tort elements.  *See* Doc. No. 189 at 1.  In light of this clarification, any argument by the Railroad that a higher burden or any of the Lone Pine elements are pertinent to its liability would be inappropriate in light of the Court's November Memorandum and Order.

3

of Union Pacific's liability encompasses rail lines that Union Pacific's predecessors historically

owned and/or operated.  Union Pacific is liable under CERCLA § 107(a)(2) as the former

owner/operator of rail lines at SEMO at the time that contaminants from mine waste were

released into the environment at SEMO or as the successor to companies that historically

operated such rail lines.  Union Pacific is also liable under CERCLA § 107(a)(1) as the current

operator of rail lines at SEMO from which there are uncontrolled releases of hazardous

substances due to the placement of historical mining waste.  Although Union Pacific is both a

current and former owner and operator, establishing its status in just one of these classes is

sufficient to establish *prima facie* liability under CERCLA.

## ANALYSIS

### I.   RELEVANT LEGAL STANDARDS

#### A.   CERCLA Overview

CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to

ensure that the costs of such cleanup efforts were borne by those responsible for the

contamination."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).

To that end, CERCLA identifies four categories of potentially responsible parties ("PRPs")

subject to liability for cleanup costs: (1) the current owner or operator of a facility; (2) previous

owners and operators who owned or operated the facility at the time of disposal of hazardous

substances; (3) any person who arranged for disposal or treatment of hazardous substances at the

facility; and (4) any person who transported hazardous substances to the facility.  42 U.S.C. §

9607 (a)(1)-(4).  A showing by a contribution plaintiff that a defendant falls into just one of these

categories is sufficient to establish liability.  *Control Data Corp. v. S.C.S.C. Corp*., 53 F.3d 930,

934 (8th Cir. 1995) ("[I]n order to prove liability, a plaintiff must show that a defendant is within

*one* of the four classes of covered persons . . . ." (*Emphasis added*)).

4

Liability under CERCLA is strict.  *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996).  Where a plaintiff makes its *prima facie* case, the defendant will be liable, regardless of actual fault or knowledge, unless it can prove one of the very limited defenses recognized under 42 U.S.C. § 9607 (b).  *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989).

Exceptions to CERCLA's broad sweep must be narrowly construed so as not to frustrate CERCLA's remedial purpose.  *See Idaho v. Hanna Mining Co.*, 882 F.2d 392, 396 (9th Cir. 1989).  "[T]he remedial nature of CERCLA's scheme requires the court to interpret its provisions broadly to avoid frustrating the legislative purposes."  *Anspec Co. v. Johnson Controls*, *Inc.*, 922 F.2d 1240, 1247 (6th Cir. 1991).  Courts therefore "construe CERCLA's limited defenses narrowly to effectuate the Act's broad policies."  *Kelley v. Thomas Solvent Co.*, 727 F. Supp. 1532, 1540 n.2 (W.D. Mich. 1989).

Here, as discussed below, the evidence indisputably shows that Union Pacific and its predecessors solely controlled the construction, operation and, more recently, the abandonments of rail lines within SEMO for over a century.  The Railroad abandoned its waste, no longer useful to it and posing environmental liabilities known to it, in an undisclosed manner that allows lead, cadmium, zinc, and other metals to continually disperse into the environment.  If Asarco's 80 million dollar cleanup is to be effective, the Railroad's waste must be uncovered and cleaned up, and that is something Asarco has paid to do.

### B.    Elements of *Prima Facie* Liability

As the Court stated in its Modified Case Management Order (Doc. No. 147), to establish a *prima facie* case for contribution under CERCLA § 113(f), a plaintiff must demonstrate that:

     i.    the defendant falls under one of four categories of "covered persons;"

     ii.   the site in question is a "facility;"

5

   iii. there was a "release" or "threatened release" of a "hazardous substance" at the

     facility; and

   iv. the release caused the plaintiff to incur response costs.

Doc. No. 189 (citing *Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc.*, 925 F. Supp. 624, 629

(E.D. Mo. 1996)); *see, e.g., Control Data Corp. v. S.C.S.C. Corps.*, 53 F.3d 930 (8th Cir. 1995).

   The CERCLA plaintiff's burden of proof is the preponderance of the evidence standard,

which the plaintiff can meet even "without direct documentary evidence." *Georgia-Pacific*

*Consumer Products LP v. NCR Corp.*, 2013 WL 5428729, *6 (W.D. Mich. Sept. 26, 2013)

(citing *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000)).  A CERCLA

plaintiff need not satisfy common law rules of causation, such as proximate cause, to meet its

burden.  *See, e.g., United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001).

   There is no minimum amount of pollution that CERCLA will tolerate.  *Johnson v. James*

*Langley Operating Co., Inc.*, 226 F.3d 957, 962 (8th Cir. 2000) (To fashion a quantitative

minimum threshold for CERCLA liability . . . is to undo the policy decision Congress has

already made: that the threat posed by hazardous substances does not depend upon a minimum

concentration or quantity."); *see also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d

648, 660 & n.7 (6th Cir. 2000).  "[E]ven a minimal amount of hazardous waste brings a party

under the purview of the statute as a PRP."  *Niagara Mohawk Power Corp. v. Chevron U.S.A.,*

*Inc.*, 596 F.3d 112, 131 (2d Cir. 2010); *see also* Doc. No.164 (discussing causation standard and

no threshold for amount of hazardous substances).

   Here, Asarco has presented evidence sufficient to establish a *prima facie* case under

section 107(a)(1) and (a)(2) that Union Pacific is liable as a current operator, as a former

owner/operator, and as the successor to former owner/operators.  The burden now shifts to Union

Pacific to establish, if it can, that it has a defense to liability under section 107.  *See Meyer*, 889 F.2d at 1508.

## II.     UNION PACIFIC IS LIABLE AS A CURRENT OPERATOR OF RAIL LINES AT SEMO

The Railroad is a "person" within the meaning of CERCLA.  Corporations are persons. 42 U.S.C. § 9601(21) (defining "person" as including a "corporation").  Union Pacific is a Delaware corporation with its headquarters in Omaha, Nebraska.  Ex. G, Deposition Transcript of Robert Grimaila at 303:10-14.

The Railroad is a current "operator" of a "facility."[4]  42 U.S.C. § 9607 (a)(1).  An operator is defined as one who is "operating such a facility."  *Id.* § 9601(20)(A).  "An operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste."  *United States v. Bestfoods*, 524 U.S. 51, 62 (1998).  Union Pacific constructed and maintained rail lines resulting in the disposal and release of hazardous substances in and near SEMO as defined by CERCLA, 42 U.S.C. § 9601 (22).[5]  There is no evidence that Union Pacific has remediated the contamination stemming from past transport of mining materials and the historical use of mine waste as construction materials along these rail lines.  Thus, hazardous substances continue to erode and disperse into the environment.  *See* Ex. F at 16, 19-20.

---

[4] CERCLA defines a "facility" as any site or area where a hazardous substance is located.  42 U.S.C. § 9601(9).  *See infra* § III.C.

[5] The Railroad may also be liable as a current owner.  An "owner" is defined as "any person owning or operating" a "facility."  42 U.S.C. § 9601 (20).  An owner need not conduct operations related to pollution to be liable.  *United States v. TIC Inv. Corp.*, 68 F.3d 1082, 1089 n. 5 (8th Cir. 1995).  So long as a person holds an ownership interest (determined by state law) in a facility at which hazardous substances are located, CERCLA liability attaches.  *Los Angeles v. San Pedro Boat Works*, 2011 WL 855858, *9 (9th Cir. Mar. 14, 2011).  Union Pacific may assert through expert testimony that all railroad rights-of-way in Missouri are held in the form of easements.  However, expert opinions as to legal ownership have been held to be inadmissible.  *Lakeside Feeders Inc. v. Producers Livestock Mktg. Ass'n*, 666 F.3d 1099, 1110 (8th Cir. Iowa 2012); *Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. Mo. 2009); *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 840-41 (8th Cir. Ark. 2003); *Cowden v. BNSF Ry. Co.*, No. 4:08CV01534 ERW, 2013 U.S. Dist. LEXIS 155486, at *20-22 (E.D. Mo. Oct. 30, 2013); *Allen v. U.S. Bank, N.A. (In re Allen)*, No. 1:03-bk-22525E, 2005 Bankr. LEXIS 3552, at *7-8 (Bankr. E.D. Ark. May 11, 2005).

Union Pacific currently operates four distinct segments of rail lines within St. Francois County.  Ex. F at 7.  First, the Railroad operates the rail line from Hoffman Junction to Monsanto ("Monsanto segment").  Ex. H, Deposition of John Hawkins at 36:21-37:19; Ex. I.  This railroad was constructed with toxic mining waste.  *See* Ex. K at 5 and 9.

Second, Union Pacific owns and operates the railroad line from the southern part of the City of Bonne Terre to Derby Junction ("Bonne Terre Branch segment").  Ex. H at 36:21-37:19; Ex. I.  The combined length of the Monsanto and Bonne Terre Branch segments is approximately 12.5 miles.  Ex. J at 2.  This railroad line was constructed with toxic mining waste.  *See* Ex. K at 5 and 9.

Third, Union Pacific owns and operates a lengthy section of the Sainte Genevieve Branch in St. Francois County ("Ste. Genevieve segment").  Ex. J at 2.  This segment runs from Bismarck to the eastern St. Francois County line.  *Id*.  The approximate length of this segment in St. Francois County is 19 miles.  *Id*.  This railroad line was constructed with toxic mining waste. *See* Ex. K at 5 and 9.  Although discovery has been very restricted at this Lone Pine stage of the case, and even though Union Pacific has made it very difficult for Asarco to get historic records from the railroad (necessitating Asarco's filings of several discovery motions, *i.e*., Doc. Nos. 151, 167, 179, and 184), we know without any doubt that Union Pacific is responsible for more than 75 miles of railroad built with contaminated mining waste.  Ex. J at 1 and 2; Ex. O at 5.

The fourth railroad segment that Union Pacific operates within SEMO to this day, was laid down near the western border of St. Francois County, from the western St. Francois County line through Bismarck to the southern St. Francois County line ("Desoto Subdivision segment"). Ex. J at 2.  The length of this section of Union Pacific's active line is approximately 14.5 miles. *See id.* This railroad line was also constructed with toxic mining waste.  *See* Ex. K at 5 and 9.

8

Union Pacific currently operates a total of approximately 46 miles through St. Francois County. Ex. H at 36:21-37:19; Ex. J.

In January 2007, in response to an order of the United States Environmental Protection Agency, another potentially responsible party was required to pay for a study of mining waste that could be located and quantified within SEMO.  That report was eventually published and is titled, Historic Railroads, St. Francois County Mine Areas Report prepared by NewFields and dated January 29, 2007 ("Historic Railroads Report"), Ex. K.  NewFields wrote the Historic Railroads Report as a part of its government ordered Focused Remedial Investigation Report, and the study is considered to be independent.  Ex. K at 1.  The Historic Railroads Report found, based on study, that 1.3 million cubic yards of rail ballast exists within 30.3 miles of rail (41,680 cubic yards per mile) compared to 39.3 million cubic yards of chat in the tailings piles.

The Historic Railroads Report further concludes the zinc and cadmium ratios measured in the rail ballast are comparable to the harmful zinc and cadmium ratios in the mining tailings piles, allowing for the logical finding that the data indicates the Union Pacific related rail ballast is mining chat or waste.  Ex. K at 10.  The Historic Railroads Report establishes large scale releases within SEMO.  Further study performed since the Historic Railroads Report uncovers even more Union Pacific railroad, built with mining waste, that totals at least 130 miles of polluting rail road track exists St. Francois County (50 miles of active and 80 miles of abandoned lines).  *See* Ex. O at 1 and 2.  Using the calculus applied by NewFields in the Historic Railroads Report, 5.4 million cubic yards of mining waste chat are present on Union Pacific's rail lines in St. Francois County.  And this amount of mining waste on abandoned rail lines in St. Francois County amounts to at least 12% of the total mining waste, or chat, in the entire County.  Again, mining chat is known to be harmful to human health and the environment, and it is the reason

why the EPA designated SEMO as a Superfund Site.  Union Pacific knows that, yet they disclaim any liability for the material.  Ex. G at 246:10-17.

Although this Brief does not argue for allocation in this Lone Pine context, it is important for the court to consider the large area of influence of the contaminated rail lines within SEMO.  They are very significant.  Active lines alone, assuming their width is fifty feet, cover nearly 6 acres for each mile of length (50 ft. * 5,280 ft./mile / 43560 sq. ft./acre = 6 acres).  Ex. B at ¶ 7.  Based upon this estimate, Union Pacific today controls more than 180 acres within St. Francois County alone.  This total area is on the same order of magnitude as the large chat and tailings piles located in SEMO.  Ex. K at 10.

Not only is Union Pacific an owner and operator under CERCLA, that ownership and those operations led to the spreading of huge quantities of toxic mining waste used to build railroads within SEMO.

## III.  UNION PACIFIC IS LIABLE AS A FORMER OWNER AND OPERATOR OF RAIL LINES AT SEMO

Union Pacific is liable under CERCLA for contamination caused during its ownership and operation of historical rail lines at SEMO.  In particular, Union Pacific operated seven lines in four counties directly and through predecessor railroads.  Ex. F, Att. 3, Fig. 1.  Former owners and operators at the time of disposal of hazardous substances are liable parties under 42 U.S.C. § 9607(a)(2).  Both a passive title owner of real property – who was unaware of or acquiesced in another's discharge of harmful pollutants on his real property (owner liability), and an active operator of a facility – who held only a possessory interest in the real property but is in fact responsible for the activities leading to a discharge or release (operator liability), are liable under CERCLA.  *Redevelopment Agency v. BNSF Ry.*, 643 F.3d 668 (9th Cir. 2011).  The law is very clear that liability as an owner does not "require that the person be involved in the disposal

activities themselves." *TIC Inv. Corp.*, 68 F.3d at 1089 n. 5.  Rather, an operator is someone

who exercises "actual or substantial control" over the activities of a facility.  *United States v.*

*Vertac Chem. Corp.*, 46 F.3d 803, 808-09 (8th Cir. 1995); *see also Bestfoods*, 524 U.S. at 66-67

(in the context of parent liability for a subsidiary, an operator is someone who "manage[s],

direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to

do with the leakage or disposal of hazardous waste, or decisions about compliance with

environmental regulations").

Union Pacific is liable for its past ownership and operation of presently contaminated rail

lines in SEMO and as the successor to entities that historically owned and operated rail lines in

SEMO.  *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir. 1992).  Union

Pacific's claim that it simply operated a railroad over contaminated rail lines that it bought or

controlled does not provide any form of a defense under CERCLA.

### A.    Union Pacific Is a Former Owner and Operator of Rail Lines Constructed With Toxic Mine Waste

Union Pacific owned real property – the railroad – that operated as the Bonne Terre

Industrial Lead line, a 1.1 mile segment in Bonne Terre, Missouri.  Ex. H at 38:6-15; Ex. L.

Union Pacific did not abandon this contaminated segment of its railroad until 2001.

Abandonment records verify Union Pacific's ownership of this contaminated area.  Ex. M,

Combined Environmental and Historic Report at 3.  When it abandoned this portion of its

railroad, Union Pacific did not inform the Surface Transportation Board – the agency with

authority to approve of the abandonment – that the land was built and contaminated with mining

waste, as required.  *See generally,* Ex. M.

There is no evidence that anyone other than Union Pacific controlled the operation of this

property.  The evidence shows that only Union Pacific controlled this property during its

ownership.  Although, during its ownership, Union Pacific had the ability to control releases of contaminants from the mining waste used to build this rail line, it did not.  Ex. G at 247:7-13. The Bonne Terre Industrial Lead rail line was constructed with mine waste and contaminants from this waste have been released to the environment.  Ex. U at 744.  Nothing has ever been done to stop the metals from leaching into the environment.  As discussed further below, any lines where Union Pacific (or its predecessors, as described below) has ceased operations remain in Union Pacific's control until their abandonment has completed a formal review and approval process through the Interstate Commerce Commission ("ICC") or its successor, the Surface Transportation Board ("STB").  *See* Transportation Act of 1920; Emergency Railroad Transportation Act of 1933.  Thus – until formally abandoned or otherwise sold or ownership transferred – Union Pacific had exclusive control of such lines and the right to exclude others, which constitutes operator liability under CERCLA.[6]  *See Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Trust*, 32 F.3d 1364, 1367-1368 (9th Cir. 1994) (holder of easement can be operator).

Union Pacific exercised control and performed affirmative acts, establishing that it was an owner and operator pursuant to CERCLA and thereby creating liability as a former owner/operator.[7]  *See Vertac Chem. Corp.*, 46 F.3d at 808-09; *Bestfoods*, 524 U.S. at 62.

---

[6] Union Pacific may assert that, based on expert testimony, the United States intervened in operations at the rail lines during discrete periods of world war and governmental necessity, or that other entities exercised some level of control over the rail lines at particular times.  Potential government or other intervention in the rail lines during a short portion of Union Pacific's and its predecessors' lengthy operations does not exonerate Union Pacific from *prima facie* CERCLA liability.  At most, this issue would be addressed during the future allocation stage of the case.
[7] Moreover, any lines where Union Pacific (or its predecessors, as described below) have ceased operations remain in Union Pacific's control until their abandonment has completed a formal review and approval process through the Interstate Commerce Commission ("ICC") or its successor, the Surface Transportation Board ("STB"). Transportation Act of 1920; Emergency Railroad Transportation Act of 1933.

**B.    Union Pacific Is Liable as a Successor to Past Rail Owners and Operators**

Union Pacific is liable for response costs associated with environmental impacts, caused

by mining waste used and abandoned in areas of SEMO in which the Railroad's predecessors

owned and/or operated.  Courts uniformly interpret CERCLA to impose liability on successor

corporations.  *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir. 1992); *see also*

*Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988); *B.F. Goodrich*;

*United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir. 1992); *Anspec Co. v. Johnson*

*Controls, Inc.*, 922 F.2d 1240 (6th Cir. 1991); *Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d

1260 (9th Cir. 1990).  "[T]he drafters of CERCLA were not blind to the universal rule the

'corporation' includes a successor corporation resulting from a merger and . . . the drafters

intended 'corporation' to be given its usual meaning."  *Mexico Feed*, 980 F.2d at 486 n.8

(quoting *Anspec*, 922 F.2d at 1246).

Union Pacific became the owner of contaminated railroad through its merger with

Missouri Pacific Railroad Company ("Missouri Pacific") in 1982.  Ex. G at 183:5-21; Ex. N at 3.

Missouri Pacific's merger with Union Pacific was approved by the Interstate Commerce

Commission in 1982 and was effective January 1, 1997.  Ex. G at 182:5-21; Ex. H at 81:3-82:23;

Ex. N.  Union Pacific was the surviving corporation of the merger.  Ex. H at 82:7-12; Ex. N at 1.

In its merger agreement with Missouri Pacific, Union Pacific agreed to assume all obligations

and liabilities of Missouri Pacific as if they were those of Union Pacific.  Ex. N at 3.

If Missouri Pacific still existed as an independent entity, there would be no question that

it would be a potentially responsible party at SEMO.  Missouri Pacific owned and operated rail

lines in SEMO during the period from as early as 1917 to 1997.  Ex. E at 5; Ex. H at 81:3-82:23.

Among others, Missouri Pacific formerly operated the Belmont Branch, which runs from

Bismarck in St. Francois County through Fredericktown and Marquand in Madison County to

13

the eastern Madison County Line, from 1917 until it abandoned the line in 1972.  Ex. F at 5; Ex.

H at 18:2-7; 21:17-19; 86:9-23.  Elevated lead levels were also measured at three different

locations along this line.  Ex. F, Att. 3, Table 4, Figure 4. These railroad lines were constructed

with contaminated mining waste that has not been removed and which is impacting human health

and the environment.  Ex. K at 5, 9-10; Ex. U at 744.

Through its merger with Missouri Pacific, Union Pacific also assumed the liabilities of

companies that Missouri Pacific previously acquired[8]–which encompasses nearly all of the

companies that owned and operated the rail lines throughout Southeastern Missouri during the

past 150 years.  Ex. C at 5-6; Ex. O at 2.  These railroad companies include the Mississippi River

and Bonne Terre Railway, Missouri Illinois Railroad Company ("Missouri Illinois"), Illinois

Southern Railroad, and the St. Louis Iron Mountain and Southern Railway Company ("SLIMS").

Ex. F at 6-7; Ex. H at 39:13-40:11; 46:8-19; 110:2-13.  These companies constructed, operated,

and maintained multiple rail lines in St. Francois and Madison Counties, beginning in the mid-

1800s.  Ex. F at 4; Ex. S at 66:9-21.  SLIMS constructed the Belmont Line in 1869 through St.

Francois and Madison Counties.  Ex. F at 6-7; Ex. O at 2.  Missouri Illinois had operating rights

at the Lead Belt Railroad that provided service to the St. Joe Lead Federal Plant.  Ex. H at 74:26-

75:23; Ex. P at 15.

Not only did Union Pacific's predecessors operate rail lines throughout St. Francois and

Madison Counties, they owned many of these lines in fee.  Rail ownership in the United States

---

[8] Union Pacific may attempt to assert that various transactions between Union Pacific's predecessors constituted asset purchases and/or did not otherwise transfer CERCLA liability.  Successor liability under CERCLA can nevertheless exist even outside the typical merger.  *See K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1020-26 (8th Cir. 2007); *Mexico Feed*, 980 F.2d at 486.  Asarco has not been provided the opportunity to conduct adequate discovery regarding the scope of these relevant transactions or to develop evidence on this fact-specific allocation issue.  *See* Doc. No. 189 at 1.  Regardless, these issues are not pertinent to whether Asarco has met its burden of establishing Union Pacific's *prima facie* liability in this case, whether as a current/former owner/operator in its own right, or as a successor to Missouri Pacific, which would be liable for its own historical operations in any event. Again, Union Pacific's potential asset purchases are potentially relevant, if at all, as a factor for equitable allocation.

prior to 1871 was typically in fee simple due to government policy to encourage the railroads to promote development of undeveloped lands.[9]  The Union Pacific Act of 1862 granted public land to the Union Pacific Railroad for each mile of track that it laid, and this was done under a system whereby land surrounding the railroad right-of-way was divided into "checkerboard" blocks, with odd-numbered lots being granted to the railroad and even-numbered lots being reserved for the Government.  *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979).  Federal statutes enacted in 1856 and 1864 divided public domain land into identical square sections, designated by alternating odd and even numbers, and gave the odd-numbered sections to states to give to railroads in fee simple, while retaining the even-numbered sections for sale by the Government.  Act of June 3, 1856, ch. 43, 11 Stat. 20; Act of May 5, 1864, ch. 80, 13 Stat. 66; *United States v. Union Pacific R. Co.*, 91 U.S. 72, 80 (1875); *Samuel C. Johnson 1988 Trust v. Bayfield County*, 649 F.3d 799, 801 (7th Cir. 2011).

In SEMO, since many rail lines such as the St. Louis, Iron Mountain and Southern Rail Company Belmont Branch[10] discussed above were constructed before 1871, these rail lines were typically held in fee with an implied condition of reverter and not as easements.  *United States v. Big Horn*, 17 F.2d 357, 365 (8th Cir. 1927); *see also Northern Pacific R. Co. v. Townsend*, 190 U.S. 267, 271 (1903).  Union Pacific's predecessors, including the Missouri Pacific, owned and operated the Belmont Branch until it ceased operations prior to 1972.  Ex. H at 18:2-14.

Union Pacific falls within the category of liable persons under section 107(a)(2) of CERCLA even if its predecessors subsequently abandoned such lines for railroad purposes. After 1920, prior ICC or STB authorization became mandatory to carry out rail line extensions and abandonments.  Transportation Act of 1920, Pub. L. No.66- 152, § 402(18), 41 Stat. 456.

---

[9] P. Gates, History of Public Land Law Development, 362-368 (1968).
[10] This rail line ran 120 miles from Bismarck to Belmont and was constructed in 1869.  Ex. K at 4.

Abandonment of a railroad does not absolve the abandoning railroad of environmental liabilities, in any event. *United States v. Cello-Foil Prods., Inc*., 100 F.3d 1227, 1232 (6th Cir. 1996) (Liability under CERCLA is strict).  Moreover, there is no evidence that Union Pacific obtained this authorization in the purported abandonments within SEMO.  These purported abandonments include the Mississippi River and Bonne Terre ("MRBT") Hoffman Branch, the Mitchell and Gumbo Branches, the mainline from Derby to Turpin, and the Crawley Branch in St. Francois County.  Ex. J at 1-2.  These abandonments do not take effect until and unless the ICC or STB has provided authorization.  *Id.*  The abandoning railroad must communicate consummation of the approved abandonment to the ICC/STB.  *Id.*  Current regulations require that the communication occur within one year, or the prior approval lapses.  *City of Ford v. United States*, 106 Fed. Cl. 136, 139 (Fed. Cl. 2012); 49 C.F.R. § 1152.29(e)(2).  Because the ICC or STB did not grant authorization to Union Pacific and its predecessors regarding many former rail lines within SEMO, these purported abandonments may have lapsed, may not be effective, and may be subject to re-opening under federal law.  Without abandonment, state property law will not be applied to determine disposition of the right of way.  *Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 136 (2011).  Phase 2 discovery will clarify this issue and Asarco intends to pursue reopening of ineffective and attempted abandonments before the United States Surface Transportation Board.[11]

### C.  Union Pacific's Rail Lines Throughout SEMO Are "Facilities" Under CERCLA § 101(9)

CERCLA defines "facility" to include any site or area where a hazardous substance is located.  42 U.S.C. § 9601(9).  "The term 'facility' should be construed very broadly to include

---

[11] Asarco would again respectfully note for the Court that it has been unable to conduct discovery on any issue, including the narrow aspect of abandonment.  Any defense by the Railroad regarding its liability cannot be resolved without properly affording Asarco the opportunity to conduct discovery on this issue.  Regardless of the difficulties though, Asarco has nevertheless met its *prima facie* obligation, and the burden has shifted to Union Pacific to which Asarco is entitled to a response.

'virtually any place at which hazardous wastes have been dumped, or otherwise disposed of.'"
*United States v. Ne. Pharmaceutical*, 810 F.2d 726, 743 (8th Cir. 1986) (quoting *United States v. Ward*, 618 F. Supp. 884, 895 (E.D.N.C. 1985) (roadsides where hazardous waste was dumped were "facilities")).

In this case, the term "facility" includes anywhere that lead and other heavy metals resulting from the mining and processing of ore throughout the SEMO sites,[12] including Union Pacific's use of mining waste in its rights-of-way, have come to be located. Ex. E at 1. Lead, cadmium, and zinc are hazardous substances. 40 C.F.R. § 302.4. The preponderance of available evidence shows that rail lines at SEMO are contaminated with such substances. There are documented levels of lead and other heavy metals throughout the lines currently operated by Union Pacific and throughout the lines formerly operated by Union Pacific and its predecessors. Ex. E at 12, Att. 3, Tables 1-4; Ex. K at 5, 9-10; Ex. Q. These elevated levels include lead, chromium, and zinc. Ex. K at 5, 9-10; Ex. F at 12.

EPA-directed testing demonstrated that track ballast in St. Francois County contains elevated levels of cadmium, lead, and zinc. Ex. F at 10. The ratios of zinc to cadmium in railroad ballast obtained by NewFields and by Asarco are comparable to the zinc to cadmium ratios in mill waste from the six mining waste piles in St. Francois County. Ex. K at 5, 9-10; Ex. F at 12. Union Pacific and its predecessors' rail lines are therefore "facilities" under CERCLA. As described below, the contamination present on and emanating from the rail lines is due to the Railroad and its predecessors' operations.

---

[12] Asarco notes that the Court approved stipulations of liability with the other parties that areas within the SEMO sites where hazardous substances have come to be located constitute "facilities" for purposes of the *Lone Pine* hearing and Asarco's ability to present a *prima facie* case. Doc. Nos. 190 (¶ 2), 192 (¶ 2), 193 (¶2). Asarco similarly contends that it has met its burden by presenting evidence that contamination exists within the St. Francois and Madison County sub-sites, but nevertheless provides evidence regarding contamination in areas within the SEMO sites, where Union Pacific and its predecessors operated, as each of these areas in turn constitute "facilities" under CERCLA.

17

**D.    There Were Releases or Threats of Releases of Hazardous Substances from the Rail Lines**

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."  42 U.S.C. § 9601(22).  Asarco need not present a minimum amount of hazardous substances released from Union Pacific's rail lines to establish its *prima facie* case.  *Johnson*, 226 F.3d at 962 (8th Cir. 2000).

EPA determined that chat contains hazardous substances and is a potential hazard to human health.  Ex. F at 15.  When left exposed to the environment, the lead in chat is a threat and a hazard to human health.  *Id.*  Chat particles can enter soil, surface water, groundwater, sediments in streams and air.  *Id.*  Exposure to lead has been known to cause learning disabilities and damage the human immune, blood, and nervous systems.  *Id.*  Children are the most susceptible to these effects.  *Id.*

The attached declaration, report, deposition testimony, and supporting documents from CERCLA expert Paul Rosasco demonstrate that there was a release or threat of release of hazardous substances by the Railroad and its predecessors within SEMO.  Ex. F at 16-17.  In construction of rail lines, the Railroad and its predecessors generally used the most readily available appropriate materials on hand, which, in this case, was chat, given the pervasive mining in SEMO.  Ex. R at 69; Ex. S 87:6-89:20; Ex. T at 3.  The Railroad and its predecessors used mining waste that contained lead, cadmium, and zinc to construct their railroad beds, to grade its railroad lines throughout SEMO, and as embankment fill.  Ex. U at 744-745.  Government agencies including the Missouri Public Service Commission and the Missouri Bureau of Mines document that track ballast used to construct rail lines within St. Francois County and Madison County consisted exclusively or predominantly of chat.  Ex. F at 8.  Historic rail trade journals

18

document that rail beds throughout SEMO were constructed of chat.  Ex. T at 1438.  The
Railroad and its predecessors also used chat to widen banks and to fill trestles.  Ex. K at 3; Ex. S
at 86:18-89:12; 89:8-17.  There have been releases of or threats of releases of lead, cadmium,
and zinc from the Railroad's facilities through physical erosion and chemical leaching from
Union Pacific's elevated rail beds composed of chat.  Ex. F at 19-20.

Chat was transported hundreds of miles and to locations as far away as Illinois.  Ex. T at
1438.  The State of Missouri's agencies further documented the extensive use of lead, cadmium,
and zinc-laden chat as ballast.  Ex. U at 714-715.  In the year 1916 alone, Missouri railroads used
more than 2 million tons of chat for railroad ballast.  Ex. R at 69.  At this time, Union Pacific's
predecessor operated two in the Bonne Terre area, the Bonne Terre Industrial Lead, a 1.1 mile
segment in Bonne Terre and the Bonne Terre to Derby Junction segment.  Ex. H, 37:7-11; 38:13-
15; Ex. J at 2; Ex. U at 744.  Union Pacific and its predecessors placed chat containing hazardous
substances throughout SEMO and abandoned this material when they abandoned their respective
rail lines.  Ex. S at 87:19-88:9.  Union Pacific abandoned the Bonne Terre Industrial Lead in
2001.  Ex. J at 2.

The Railroad also used its rail lines in SEMO to transport lead ore, chat, and other mining
materials containing metals.  Ex. O at 7-8; Ex. U at 714-715.  Wrecks and derailment of Union
Pacific and its predecessors' chat trains occurred during historical operations, resulting in
releases of lead ore, ore concentrates, and chat containing lead, cadmium, and zinc to the
environment.  Ex. E at 16, 19-20; Ex. S at 68:13-69:12.  Contamination further resulted from the
Railroad's historical practice of carrying lead ore in open cars at high speeds.  Ex. S at 66:2-23.

Testing by a certified environmental laboratory of ballast from abandoned rights-of-way
at Bonne Terre in St. Francois County and railroad ballast from locations formerly owned by

Union Pacific along the abandoned Missouri Pacific line on City of Fredericktown property in Madison County demonstrates that the heavy metals present in Union Pacific's abandoned rail beds leach into the environment and into nearby waterways.  Ex. F at 11-12, 16.  These waterways include a tributary of the Big River, Turkey Creek.  Ex. S at 129:4-13.  In addition, due to periods of heavy rain and erosion of rights-of-way embankment over many decades, the rail beds themselves erode into, and contribute sediments to, waterways throughout SEMO.  Ex. F at 20.  EPA reported high levels of the metals lead, cadmium, and zinc in multiple studies throughout St. Francois and Madison Counties.  Ex. D at 1; Ex. E at 1.

The presence of chat in railroad ballast and embankment material causes a release of hazardous substances to the environment.  Ex. F at 13, 20.  The contamination is directly related to Union Pacific and its predecessors' use of its rail lines in SEMO to transport lead ore, chat, and other contaminated materials, as contamination resulted from spilling, overturning, washouts, and routine grading and filling of the rail line.  Ex. S at 66:2-23; 68:13-69:22; 128:16-131:24; Ex. K at 1, 9.  Union Pacific also carried out routine track maintenance, repair, and ballast replacement activities during its operations that contributed to contamination.  Ex. S at 67:9-68:12.

Erosion and dissolution of metals from the Railroad's track ballast resulted in the "release," or "threat of release" of lead, cadmium, and zinc.  Ex. E at 14-18; Ex. S at 128:16-129:13.  Washouts occurred on Union Pacific rail lines that eroded Union Pacific's ballast away from beneath the railroad tracks.  Ex. S at 129:18-131:23; Ex. V.  Testing of the abandoned mining waste used as ballast by Union Pacific's predecessors' shows very high levels of lead and other metals.  Ex. F. at 20.  These data, combined with visible erosion of track ballast, embankments, and bridge abutments, show that materials used to construct the existing and

abandoned rail lines in St. Francois and Madison Counties are responsible for past and ongoing releases of hazardous substances at SEMO.  Ex. F at 20.

### E.   Union Pacific's "Releases" Caused Asarco to Incur Response Costs

Site studies and data show indisputable and significant releases of cadmium, lead, and zinc from locations where Union Pacific operated facilities.  Ex. F at 16-19; Ex. K.  Asarco is not required to prove any minimum or threshold quantity requirement to establish liability.  *See Johnson* , 226 F.3d at 962 (8th Cir. 2000); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989).  Such imposed standards are deemed "irrelevant for CERCLA liability purposes," because there is no statutory basis for such a limitation.  *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993) ("*Alcan II*); *see also United States v. Rohm & Haas*, 939 F. Supp. 1142, 1149 (D.N.J. 1996).  Nor is Asarco obligated to establish, under common law rules, how Union Pacific's releases "caused" Asarco's response costs.  *See, e.g., United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001).  "Rather, once the requisite connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), it is enough that response costs resulted from 'a' release or threatened release–not necessarily the defendant's release or threatened release."  *Id*. at 716. Asarco "need not trace or 'fingerprint' [Union Pacific's] wastes in order to recover under CERCLA."  *Id.*

Union Pacific operated rail lines in SEMO that were proximate to the tailings piles that Asarco has paid to cleanup.  Union Pacific operated adjacent to three tailings piles in St. Francois County: at North Bonne Terre, at Leadwood, and at Columbia Mine, which is near Flat River.  Ex. H at 47:14-16; 49:5-13.  Union Pacific owned rail lines that were adjacent to or within SEMO tailings piles.  Ex. H at 48:5-11.

21

SEMO includes hundreds of square miles.  Ex. D at 1.  EPA has therefore developed a step-by-step approach to remediation and will first cleanup tailings piles to address human health risks at residential properties.  Ex. W.  EPA has a strategy to address contamination at abandoned rail lines in SEMO.  Ex. X at 1.  In fact, EPA states that future actions will include cleanup of areas at and around abandoned rail lines in SEMO.  Ex. Y.  Thus, EPA will likely expend funds received from Asarco's settlement payment to address contamination of abandoned rail lines in SEMO.  Ex. B at ¶¶ 8, 9 and 10.  Union Pacific's abandoned Bonne Terre rail line, where testing by an independent certified environmental laboratory documents elevated levels of lead, cadmium, and zinc, falls squarely within the category of locations EPA has identified for cleanup through Asarco's SEMO settlement payment.  Ex. F at 11-12.  The facts are clear that there have been releases to the environment and to surface waters from Union Pacific's embankments and ballast composed of chat.  Ex. F at 19-20.  EPA will address the resulting contamination to sediment and surface water in future clean-ups to which Asarco has contributed funds.  Ex. W.

Union Pacific's release of cadmium, lead, and zinc caused Asarco to incur response costs at SEMO to pay for the costly remediation of the SEMO Sites.  These three heavy metals also are the undisputed "drivers" or reason for the SEMO Sites' clean-up.  Ex. D; Ex. E.  Asarco agreed to settle the United States' and State of Missouri's claims at SEMO for $79,513,163, in settlement of the Governments' joint and several liability claims in bankruptcy proceedings in the Southern District of Texas.  Ex. C at 3-6.  Asarco incurred these response costs through a judicially approved settlement agreement between the Plaintiff, the United States, the State of Missouri and Doe Run; consequently, those costs are necessary and consistent with the National Contingency Plan.  *Id*.; 40 C.F.R. § 300.700(c)(3)(ii); *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1132 (D. Or. 1996).  In cases such as this, where EPA is the lead agency overseeing clean-

up under the SEMO settlement, the response costs incurred by EPA are presumed to be consistent with the national contingency plan.  *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 528 (2d Cir. 1996); *see also Tennessee v. Roane Holdings Ltd*., 835 F. Supp. 2d 527, 536 (E.D. Tenn. 2011).  Through this settlement, Asarco voluntarily agreed to pay included more than its allocable share, particularly as to the remediation of cadmium, lead, and zinc contributed by Union Pacific.  Over $29 million in settlement funds will be used in the sub-sites where Union Pacific and its predecessors operated and contributed to the spread of hazardous substances into the environment.  Ex. C at 3-4.  Nowhere does CERCLA require a plaintiff who has paid for a cleanup to await application of those funds to a site, and courts routinely allow contribution claims to go forward.  *See, e.g., Am. Cyanamid Co. v. Capuano,* 381 F.3d 6, 27 (1st Cir. 2004) (upholding contribution judgment based on estimated costs).  In fact, allowing private contribution actions to proceed as soon as a private entity settles with the government is precisely what CERCLA anticipates and furthers what this Court has described as one of the "fundamental goals" of CERCLA:  to "encourage and facilitate voluntary settlements" with the government.  *Aetna Cas.& Surety Co. Inc. v. Pintlar Corp*., 948 F.2d 1507, 1517 (9th Cir. 1991) (citation omitted).

Asarco is entitled to reimbursement of a fair share of response costs from Union Pacific. Asarco has met its burden to establish Union Pacific's *prima facie* liability by demonstrating first that Union Pacific, through its own direct operations and as a successor, is a current and former owner and/or operator of a rail lines from which hazardous substances–lead, cadmium, and zinc– were released throughout St. Francois and Madison Counties.  Although Union Pacific falls into several categories of liable persons (including current owner, current operator, past owner, and past operator), its status as only *one* of these classes of liable parties is sufficient under

CERCLA.  Second, Asarco has shown that these rail lines constitute facilities because hazardous wastes were disposed there historically and have not been remediated.  Third, there have been and are releases and the continuing threat of releases in Francois and Madison Counties at SEMO.  Finally, these releases caused Asarco to incur response costs.

## CONCLUSION

Commencing more than 150 years ago, Union Pacific's predecessors used mine waste containing elevated levels of cadmium, lead, and zinc as ballast to construct rail lines throughout the SEMO Sites.  Further, Union Pacific's predecessors carried lead ore in open cars, and spills and derailments resulted in the spilling of lead ore, ore concentrates, and chat on its facility.  Asarco paid to clean-up Union Pacific's waste.  During Union Pacific's operations in SEMO and until the present time, Union Pacific did nothing to prevent, control or remediate this continuous release of cadmium, lead, and zinc into local waterways.  Asarco cooperated with the government and paid over $29 million plus interest to remediate the soils, surface water, and sediments in St. Francois and Madison Counties, thereby also paying for the cleanup of Union Pacific's cadmium, lead, and zinc that has contaminated SEMO.  Asarco therefore, has a statutory right of contribution against Union Pacific under section 113(f) of CERCLA.  Asarco has established a *prima facie* case against Union Pacific under CERCLA.  This action should now progress from the preliminary phase regarding *prima facie* liability and proceed as a contribution action under section 113(f) of CERCLA.

Dated:  May 14, 2014                    by: /s/ Gregory Evans_____
                                        Gregory Evans (CA SBN 147623), *Admitted Pro Hac*
                                        Laura G. Brys (CA SBN 242100), *Admitted Pro Hac*
                                        INTEGER LAW CORPORATION
                                        633 West Fifth Street, Floor Sixty Seven
                                        Los Angeles, California 90071
                                        Telephone: (213) 627-2268
                                        E-Mail: gevans@integerlegal.com
                                        E-Mail: lbrys@integerlegal.com

24

and

W. James Foland (SBN 25022)
Michael L. Belancio  (SBN 50115)
FOLAND, WICKENS, EISFELDER, ROPER &
HOFER, PC

Commerce Tower
911 Main Street, 30th Floor
Kansas City, Missouri 64105
Telephone: (816) 472-7474
Facsimile:  (816) 472-6262
E-Mail: jfoland@fwpclaw.com
E-Mail: mbelancio@fwpclaw.com

Attorneys for ASARCO LLC

25

**CERTIFICATE OF SERVICE**

I certify that on the 14th day of May, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

By: /s/ Gregory Evans
Gregory Evans