# EXHIBIT S

# In The Matter Of:

*ASARCO, LLC*

*v.*

*NL INDUSTRIES, INC.*

_____

*BROWN, FRANKLIN, 30(b)(6) - Vol. 1*
*November 8, 2013*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ASARCO, LLC,                  ) CASE NO. 4:11-CV-00864 JAR
                              )
     PLAINTIFF,               )
                              ) 30(b)(6)
     vs.                      ) VIDEOTAPE DEPOSITION
                              ) OF FRANKLIN BROWN
NL INDUSTRIES, INC.,          )
ET AL.,                       )
                              )
     DEFENDANTS.              )

       VIDEOTAPE DEPOSITION OF FRANKLIN BROWN, taken before Mary Lou Harmon, RPR, CRR, CSR(IA), CCR, General Notary Public within and for the State of Nebraska, beginning at 9:00 a.m., on the 8th day of November 2013, at Cassem, Tierney, Adams, Gotch & Douglas, Suite 302, 9290 West Dodge Road, Omaha, Nebraska.

FRANKLIN BROWN, 30(b)(6) - 11/8/2013

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
     MR. GREGORY EVANS
 3   INTEGER LAW CORPORATION
     633 West Fifth Street
 4   Floor 67
     Los Angeles, CA 90071
 5   (213)892-4488  FAX(213)627-2579
     gevans@integerlegal.com
 6
     FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY:
 7   MS. CAROLYN L. MCINTOSH
     PATTON BOGGS, LLP
 8   1801 California Street
     Suite 4900
 9   Denver, CO 80202
     (303)894-6127  FAX(303)894-9239
10   cmcintosh@pattonboggs.com
11   MR. NORTON A. COLVIN, JR.
     COLVIN, CHANEY, SAENZ & RODRIGUEZ, LLP
12   1201 East Van Buren Street
     P.O. Box 2155
13   Brownsville, TX 78522
     (956)542-7441  FAX(956)541-2170
14   na.colvin@rcclaw.com
15   FOR THE DEFENDANT ANSCHUTZ MINING CORPORATION:
     MR. WINSTON E. CALVERT            (via telephone)
16   ARMSTRONG TEASDALE, LLP
     7700 Forsyth Boulevard
17   Suite 1800
     St. Louis, MO 63105
18   (314)259-4752  FAX(314)552-4883
     wcalvert@armstrongteasdale.com
19
     FOR THE DEFENDANT NL INDUSTRIES:
20   MR. JOEL L. HERZ                  (via telephone)
     LAW OFFICES OF JOEL L. HERZ
21   3573 E. Sunrise Drive
     Suite 215
22   Tucson, AZ 85718
     (520)529-8080
23   joel@joelherz.com
24
     Also Present: Mr. John Powers  (via telephone)
25                 Mr. Jay Rollins - Videographer
```

```
 1                    I N D E X
 2                                                    PAGE
     CASE CAPTION ......................................1
 3   APPEARANCES .......................................2
     DEPOSITION INDEX ................................3-4
 4   TESTIMONY AND PROCEEDINGS .........................5
     COURT REPORTER NOTARY PUBLIC CERTIFICATE .......184
 5
     DIRECT EXAMINATION
 6      BY MR. EVANS: ..................................11

 7   EXHIBITS:                                       MARKED

 8   EXHIBIT A. Objection to Notice ....................9

 9   Exhibit 26. Notice ...............................21

10
     EXHIBITS PREVIOUSLY MARKED:                   IDENTIFIED
11
     Exhibit 1.UP's Answer to Complaint ..............70
12
     Exhibit 2.Chronological History .................71
13
     Exhibit 3.Union Pacific in Missouri .............78
14
     Exhibit 4.NewFields' Report .....................79
15
     Exhibit 5.Photograph ...........................107
16
     Exhibit 6.Photographs ..........................109
17
     Exhibit 7.Various Articles .....................111
18
     Exhibit 8.Railway Age Gazette Article ..........112
19
     Exhibit 9.Public Service Commission ............141
20
     Exhibit 10.State Geologist Report ..............161
21
     Exhibit 11.Maps ................................166
22
     Exhibit 13.Letter Dated 11/30/00 ...............176
23
     Exhibit 14.Agreement and Covenant ..............176
24
     Exhibit 15.Photographs .........................130
25
```

FRANKLIN BROWN, 30(b)(6) - 11/8/2013

 1    Exhibit 16.Letter Dated 12/5/03 ................177
 2    Exhibit 17.Map ................................182

 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   BY MR. EVANS:
 2       Q.   Did you know at the time that you were
 3   roadmaster that ore concentrate had high levels of lead
 4   in it?
 5       A.   Yes.
 6       Q.   And you knew at that time that the company
 7   was -- company was operating open hopper cars with lead
 8   concentrate in it?
 9              MS. MCINTOSH:  Objection.  The question
10   is vague.
11              THE WITNESS:  Yes.
12   BY MR. EVANS:
13       Q.   How fast did those trains go?
14              MS. MCINTOSH:  Objection.  The question
15   is vague.
16              THE WITNESS:  They run probably 50 miles
17   an hour.
18   BY MR. EVANS:
19       Q.   Uncovered?
20       A.   Yes.
21       Q.   Describe lead ore concentrate.
22       A.   Well, it's a real fine material that, you
23   know, is loaded into hopper cars.
24       Q.   Do you know how many tons of ore concentrate
25   Union Pacific or the predecessor railroads transported
```

1    A.   Yes.  We had to block it, because we'd do
2    things that make it unsafe to run trains, so...
3    Q.   Did you ever perform maintenance on the
4    mainlines without obtaining a block such that rail
5    traffic could go through?
6         MS. MCINTOSH:  Objection:  Beyond the
7    scope of the topics.
8         THE WITNESS:  No, not really, no.
9    BY MR. EVANS:
10   Q.   And when I say "block," I'm referring to a red
11   block?
12   A.   I know what you're talking about.
13   Q.   Did you ever observe any derailments on the
14   railroad?
15        When I say "railroad," I'm referring to UP and
16   all the predecessor companies, okay?
17   A.   Yes.
18   Q.   Did you ever observe any derailments in the
19   southeast mining area?
20        MS. MCINTOSH:  Objection to the extent
21   that you've incorporated all the predecessors, it calls
22   for a legal conclusion.  It's beyond the scope of the
23   topics.
24   BY MR. EVANS:
25   Q.   Go ahead, sir.

```
 1        A.   Yes.
 2        Q.   What kind of derailments did you observe?
 3        A.   Well, most generally derailment of cars, you
 4   know, that it's either derailed off the track or turned
 5   over or whatever, you know.
 6        Q.   Did you ever observe derailments where cars
 7   actually turned over?
 8        A.   Yes.
 9        Q.   Did you ever observe derailments in the
10   southeast mining area where cars turned over and
11   materials from those cars spilled out?
12        A.   I've had materials spilled out, yes.
13        Q.   What was the main material that was hauled in
14   the southeast mining area?
15             MS. MCINTOSH:  Objection.  The question
16   is vague.
17   BY MR. EVANS:
18        Q.   In your experience on the railroad?
19        A.   Most of -- most of the material was iron ore
20   or lime or concentrate.
21        Q.   Lead ore?
22        A.   Lead ore.
23        Q.   Does Union Pacific today have active lines in
24   Missouri?
25             MS. MCINTOSH:  Objection:  Beyond the
```

1  scope of the topics.
2         THE WITNESS:  Yes.
3  BY MR. EVANS:
4     Q.   What are those lines called, do you know?
5         MS. MCINTOSH:  Objection.  The question
6  is vague.
7         THE WITNESS:  Well, we still got the
8  mainlines that runs through a lot of places.  We got
9  sidings and branch lines.
10 BY MR. EVANS:
11    Q.   Branch lines.  Let's talk about branch lines.
12        Do you have -- does Union Pacific have branch
13 lines running today in SEMO?
14    A.   Yes.
15    Q.   Do you know what company operated those branch
16 lines before Union Pacific?
17    A.   Missouri Illinois operated most of them.
18              (Exhibit No. 1 previously
19              marked in prior depositions.)
20 BY MR. EVANS:
21    Q.   I show you what's been marked as Exhibit 1.
22        Have you ever seen that document before?
23        This is Union Pacific's answer to ASARCO's
24 second amended complaint.
25    A.   I don't know as I did.  No, I don't think so.

```
 1        A.   Yes.
 2        Q.   Did any of the railroads that you worked for
 3   operate in that county?
 4        A.   Yes.
 5        Q.   Which railroad?
 6        A.   Well, it was originally the Missouri Illinois
 7   Railroad operated in it, and eventually Missouri Pacific
 8   merged with them.
 9        Q.   And eventually the Missouri Pacific merged
10   with Union Pacific?
11             MS. MCINTOSH:  Objection:  Calls for a
12   legal conclusion.
13             THE WITNESS:  Yes.
14   BY MR. EVANS:
15        Q.   Let me show you a statement then on Page 3 of
16   Exhibit 4 regarding railroad construction.
17        A.   Okay.
18        Q.   Do you agree that the railroad in this area,
19   St. Francois County, that the railroad grade was
20   constructed using the cut-and-fill method?
21             Do you agree with that statement?
22        A.   I don't know -- I don't know -- I don't know
23   that, because I wasn't there when it was constructed.
24        Q.   Do you agree with the statement that the final
25   cover consisted of 12 to 18 inches of chat, as indicated
```

```
 1   on Page 3 of Exhibit 4?
 2              MS. MCINTOSH:  Objection.  The question
 3   is vague.
 4              THE WITNESS:  It was -- the final 12 to
 5   18 inches was constructed of ballast, yes.
 6   BY MR. EVANS:
 7       Q.  You agree with the statement that the chat
 8   provided a granular, easily handled, well-drained
 9   aggregate for bedding the wooden cross ties?
10           Do you agree with that statement?
11              MS. MCINTOSH:  I object that the question
12   is vague, and that the document speaks for itself.
13              THE WITNESS:  The chat -- the chat that
14   is referred to was -- it was a good bedding at the time,
15   but it was not -- later on years it was not.  Chat was
16   easy to walk on was really the only good thing that it
17   was ever used for.
18   BY MR. EVANS:
19       Q.  Do you agree with the statement on Page 3 of
20   Exhibit 4 concerning the railroad construction in
21   St. Francois County that besides side slopes, relatively
22   thin chat ballast was observed in flat cut sections
23   through hills and where the grade was constructed on
24   existing topography?
25              MS. MCINTOSH:  Objection.  The question
```

```
 1   is vague; compound.
 2   BY MR. EVANS:
 3       Q.   Does Union Pacific agree with that statement?
 4       A.   On that railroad chat was used on most all of
 5   it prior to our merging with them.
 6       Q.   When you say "most all of it," what are you
 7   referring to?
 8       A.   Most all of the Missouri Illinois Railroad
 9   chat was used on it.
10       Q.   When you say before we merged with them, what
11   company?
12       A.   Before Union -- before Missouri Pacific merged
13   with them.
14       Q.   Do you agree with the statement on Page 3 of
15   Exhibit 4 that fill was used across low-lying areas at
16   stream crossings, and where it was necessary to
17   construct ramps to crest a divide?
18            Do you agree with that statement on behalf of
19   Union Pacific?
20              MS. MCINTOSH:  Objection.  The question
21   is vague and compound.  The document speaks for itself.
22              THE WITNESS:  As I said a while ago, I
23   don't know what all the fill was built out of before I
24   took it over.
25
```

```
 1   BY MR. EVANS:
 2       Q.   Do you know whether the fill was built out of
 3   mining waste?
 4       A.   Not to my knowledge.
 5       Q.   In fact, you don't know what all the fill was
 6   made of?
 7       A.   Not all down through it, no, I don't.
 8       Q.   Do you agree with the statement at Page 3 at
 9   Exhibit 4 that chat was used almost exclusively where
10   large quantities of fill were needed to meet grade
11   requirements?
12            Do you agree with that statement?
13       A.   There was a lot of it used, I know that, yes.
14       Q.   A lot of it used where, sir?
15       A.   Well, there was a lot of it used as fill
16   material and as ballast too on the Missouri Illinois
17   Railroad.
18       Q.   When the Missouri owned those railroads, do
19   you know where that chat came from?
20       A.   No, because it was built before my time.
21       Q.   Did the Missouri Pacific acquire the
22   Mississippi River and Bonne Terre Railroad?
23                MS. MCINTOSH:  Objection:  Calls for a
24   legal conclusion.
25                THE WITNESS:  That was -- yes, that was
```

```
 1   you didn't understand?
 2       A.   Ask it again.
 3       Q.   Do you know what Union Pacific constructed --
 4   Union Pacific predecessor railroads used to construct
 5   the railroads next to water that you testified about?
 6            MS. MCINTOSH:  Objection.  The question
 7   is vague, it's beyond the scope of the topics.  It also
 8   calls for a legal conclusion.
 9            THE WITNESS:  I don't know -- I don't
10   know all the way to the bottom of the railroad, no, what
11   it was constructed out of.
12   BY MR. EVANS:
13       Q.   All right.  Thank you.  And you weren't there
14   when they were constructed; right?
15       A.   That's right, I wasn't there.
16       Q.   Okay.  Do you know whether any of the
17   materials that were used to construct the railroads fell
18   into any of the water that you've described, the rivers
19   or the streams or the -- off the bridges?
20            MS. MCINTOSH:  Objection.  The question
21   is vague and compound.
22            THE WITNESS:  Oh, I'm sure that there is
23   some that may have washed into it, you know, during the
24   rains, heavy rains and --
25
```

```
 1  BY MR. EVANS:
 2      Q.   Floods?
 3      A.   Floods, what have you, yes.
 4      Q.   What rivers are you talking about where that
 5  material you're sure washed into?
 6              MS. MCINTOSH:  Objection.  The question
 7  mischaracterized Mr. Brown's testimony, and was vague.
 8              THE WITNESS:  Mostly -- mostly we run
 9  along the Mississippi River, we run along Bay River, we
10  run along Black River, and several creeks.
11  BY MR. EVANS:
12      Q.   Which might include Turkey Creek?
13      A.   Could.
14              MS. MCINTOSH:  Objection:  Calls for
15  speculation.
16              THE WITNESS:  Could be.
17  BY MR. EVANS:
18      Q.   In terms of the maintenance-of-way, one of the
19  reasons that you need to -- was one of the reasons that
20  you needed to bring in fill was because the material
21  that was on these railroads would erode; is that right?
22              MS. MCINTOSH:  Objection.  The question
23  is vague.
24              THE WITNESS:  Some erosion.  More so --
25  more so washouts and stuff like that.
```

1   BY MR. EVANS:

2       Q.   What's a washout?

3       A.   It's -- a washout is whenever you get real

4   heavy, heavy rains and floods, it washes the ballast, to

5   dump everything out from under the track.

6                  (Exhibit No. 15 previously

7                  marked in prior depositions.)

8   BY MR. EVANS:

9       Q.   Let me show you what's been marked as

10  Exhibit 15, Mr. Brown.

11        Can you tell, looking at Exhibit 15, including

12  the color photograph that might give you a better view,

13  what -- whether there is railroad track on top of that

14  hill?

15      A.   I do see -- I do see some rail and ties on top

16  of there, yes.

17      Q.   And when you talk about washout -- excuse me.

18  When you talk about erosion, do you see that gap

19  underneath the railroad and railroad ties depicted on

20  kind of the right-hand corner of Exhibit 15?

21          MS. MCINTOSH:  I object to the form of

22  the question.  It's vague and compound.

23          THE WITNESS:  Yes, I see it.

24  BY MR. EVANS:

25      Q.   Does that look like erosion to you based on

```
 1   your experience on the Union Pacific?
 2              MS. MCINTOSH:  I object that the question
 3   is vague.
 4              THE WITNESS:  It could be erosion, or it
 5   could be a washout.
 6   BY MR. EVANS:
 7       Q.   Thank you.  But that's what, in your
 8   railroading experience, a washout or erosion looks like?
 9              MS. MCINTOSH:  Objection:  Calls for
10   speculation, and the question is vague.
11              THE WITNESS:  Yes.
12   BY MR. EVANS:
13       Q.   Can I ask you, please, to circle the area on
14   Exhibit 15 on the color photo that you've been referring
15   to as an area that illustrates what a railroad washout
16   or erosion looks like?
17              MS. MCINTOSH:  I object to the form of
18   the question.
19              THE WITNESS:  [Complies.]
20   BY MR. EVANS:
21       Q.   Can you put your initials next to the circle
22   on the bottom, please?
23       A.   [Complies.]
24       Q.   Thank you, Mr. Brown.
25              Did you become familiar with any of the
```

```
 1                  CERTIFICATE OF REPORTER
 2            I, Mary Lou Harmon, a Certified Shorthand
 3   Reporter, hereby certify that the witness in the
 4   foregoing deposition was by me duly sworn to tell the
 5   truth, the whole truth, and nothing but the truth in the
 6   within-entitled cause;
 7            That said deposition was taken down in
 8   shorthand by me, a disinterested person, at the time and
 9   place therein stated, and that the testimony of the said
10   witness was thereafter reduced to typewriting, by
11   computer, under my direction and supervision;
12            That before completion of the deposition,
13   review of the transcript was requested.  Any changes
14   made by the deponent (and provided to the reporter)
15   during the period allowed are appended hereto.
16            I further certify that I am not of counsel or
17   attorney for either or any of the parties to the said
18   deposition, nor in any way interested in the event of
19   this cause, and that I am not related to any of the
20   parties thereto.
21          DATED:    November 13, 2013
22
                       MARY LOU HARMON, RPR, CRR
23                              CSR NO. 0112
24   My commission expires:
25
```