# EXHIBIT 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ASARCO LLC, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>NL INDUSTRIES, INC., a New Jersey corporation; ST. FRANCOIS COUNTY ENVIRONMENTAL CORPORATION, a Missouri corporation, DELTA ASPHALT, INC., a Missouri Corporation; ANSCHUTZ MINING CORPORATION, a Colorado corporation; BNSF RAILWAY COMPANY, a Delaware corporation; UNION PACIFIC RAILROAD COMPANY, a Utah corporation; and DOES 1-50, inclusive,<br><br>Defendants. | ) No. 4:11-cv-00864-JAR |

VIDEOTAPED 30(b)(6) DEPOSITION OF
JOHN CHRISTOPHER PFAHL
Tucson, Arizona
March 19, 2014
9:00 a.m.

REPORTED BY:

Robin L. B. Osterode, RPR, CSR

AZ Certified Reporter No. 50695

A. Yes.

Q. Do you recall who was in charge of the environmental conditions there?

A. I do not recall.

Q. Do you recall personnel from the Glover Smelter and/or personnel with responsibilities for the Glover Smelter participating in these information exchanges?

A. There were different managers who would come to the meetings, so there was a manager at Glover who...

Q. What name do you recall?

A. I think Terry Erskine who came out of Northwest Mining ended up being a manager at Glover. Curtis Bates was a manager at Glover who would often participate.

Q. Uh-huh. So prior to the -- the SEMO settlement in bankruptcy, do you recall Asarco undertaking any environmental remediations at either West Fork, Sweetwater, or Glover, other than those related to ongoing operational permits?

A. At those three sites, there was no remediation being done.

Q. Okay. Since the SEMO settlement, are you aware of Asarco spending any money for environmental

remediation at those three locations, meaning West Fork, Sweetwater, and Glover?

A. No. The point of the settlement was to resolve all those outstanding issues. So the settlements broke out how much went to whom and for each site.

Q. So you would not expect there to be any further responsibility that Asarco has for environmental remediation at those three locations?

A. We would have no responsibility whatsoever.

Q. Okay. Do you know where Donald Robbins is today?

A. Yes.

Q. Tell me.

A. Scottsdale.

Q. Do you have an address for him?

A. I don't, but he's a retired Asarco guy. We have his address.

Q. I'm sure we can find him. I just thought I'd ask if you knew.

When was the last time you had any contact with Mr. Robbins?

A. Three weeks ago.

Q. And what was that for?

A. We were doing similar depositions on a site

to enter into the SEMO settlement, whether those were two distinct events or whether they were all at the same time. And I'm asking whether or not you looked at corporate minutes for the purposes of determining whether there was a difference in that decision-making process?

MR. FOLAND: I object to the question as it relates to this witness responding to any inquiry concerning Asarco's assessment of its liability for all of the reasons stated previously in the written objections, and instruct the witness not to answer as to that issue.

BY MR. CONNELLY:

Q. And are you going to follow counsel's instruction in that regard, Mr. Pfahl?

A. I will answer that I did not review any of the corporate minutes --

Q. Okay.

A. -- for any purpose.

Q. Okay. Topic 8, then, asks about Asarco's evaluation and assessment of Union Pacific's potential liability for the SEMO sites. Have you gathered any information from any source to determine what corporate assessment was made by Asarco regarding UP's liability?

A. Yes.

Q. What have you done in that regard?

A. I reviewed the document that was prepared by Newfields, and they had sampled railroads, I believe in 2007. And that work was done for Asarco in the bankruptcy realm. I reviewed some sampling data that -- some more recent sampling data from railroad rights-of-way that Asarco had authorized, and I also reviewed the extra -- expert report of Mr. --

Q. Rosasco?

A. -- Rosasco. Thank you.

Q. All right. So that we're clear, are you aware of any information available to Asarco or known by Asarco concerning Union Pacific's potential liability for SEMO, other than what may be reflected in the Newfields report in 2007, the sampling data that you reviewed, and the Rosasco expert report?

A. For the SEMO site, I'm not aware of any other.

Q. Yeah, I meant to say the SEMO site. And I'm only asking you about the SEMO site, if I don't make that clear.

A. Okay.

Q. So for the SEMO sites, you're not aware of

any other information available to Asarco?

A. No.

Q. In preparing for this deposition, did you go to anyone within the Asarco organization for the purpose of saying, what do you know about UP's potential liability at the SEMO sites?

MR. FOLAND: Let me object.

To the extent that you spoke with any counsel about UP's potential liability or liability, I'm going to instruct you not to answer. To the extent you spoke with someone else, some corporate person or other within the organization, go ahead and answer.

THE WITNESS: I did not speak to anyone within Asarco as to that subject.

BY MR. CONNELLY:

Q. Okay. So as the Asarco representative, how did you identify the NewFields report, the sampling data, and the Rosasco report as being information that addressed UP's potential liability at SEMO?

A. Those reports were provided by counsel.

Q. Okay. So have you undertaken any independent review of documents within the Asarco organization to develop any other information than reflected in the documents you identified?

A. Over the years I've reviewed numbers of documents relating to railroads at various sites where I was manager around the United States and potential liabilities that the railroads might have at those various sites, not specifically the SEMO site.

Q. Okay. Well, specifically involving Union Pacific?

A. Yes.

Q. And are you telling me that that is information available to you within the company that has a bearing on Union Pacific potential liability at SEMO?

A. Well, what we're talking about is how railroad beds were built and materials that they were built out of, and SEMO's no different than, say, Coeur d'Alene Basin.

Q. So your information in this regard is not based on what you've heard from anyone else or any documents that you gathered from any other source, it's based on personal experiences you've had?

A. Yes, as an -- and an employee of Asarco --

Q. Okay.

A. -- in my capacity as a closed plant site manager.

Q. Okay. So let's focus on that. Did any of these other sites with which you've had experience and believe may have some materiality to UP's potential liability at SEMO, involve UP operations?

A. Yes.

Q. Okay. Which ones?

A. Coeur d'Alene Basin.

Q. Okay. And what was there about your experience at Coeur d'Alene Basin that you think may have some bearing on UP liability at the SEMO sites?

A. At Coeur d'Alene Basin, UP -- and when I say "UP," I'm going to include predecessor companies, companies that may have been acquired over the years, but UP was the owner of the Wallace branch, it was called. That particular railroad was constructed with -- portions of it were constructed with mine waste and tailings, similar story to SEMO.

Q. Okay. What kind of mine?

A. Lead/zinc mines.

Q. Okay. And your knowledge about the railroad beds being constructed with mine waste tailings, does it come from personal observations of the building of the road beds or observations after the fact or what?

A. I was the site manager for Asarco at the --

Are you aware of a final ever being done?

A. I am not.

Q. And this -- the title of this report is "Historic Railroads, St. Francois County Mined Areas." Right?

A. That is correct.

Q. Does this limit the historic railroad discussion in this report to St. Francois County?

A. That's what it's limited to.

Q. Okay. And you've looked at this. Do you see anyplace in here where Union Pacific Railroad is mentioned in any way?

A. I do not believe Union Pacific is directly mentioned.

Q. Did you see anything in this report of historic railroads that, based upon your knowledge, the company's knowledge, your experience, you associate with Union Pacific Railroad?

A. Some of these railroads were acquired by Union Pacific.

Q. Tell me which ones and how you know that.

A. I believe the Missouri Pacific Railroad.

Q. Tell me where you're looking and I can look with you.

A. Page 3.

Q. 3 as the report is numbered, as opposed to the --

A. As the report is numbered.

Q. -- as to the -- instead of the document number in the lower right corner? All right.

A. This page lists a number of different railroads that are located within St. Francois County. Some of these railroads, according to the expert report by Mr. Rosasco, were obtained by Union Pacific.

Q. Okay. So let me try to approach it this way. Looking at the list of railroads on page 3, other than what's reported by Mr. Rosasco, do you have any other information that any of those railroads listed were acquired or are now a part of Union Pacific Railroad?

A. I read the deposition of a Union Pacific individual who spoke as to these various railroads.

Q. Yes, sir. Who is that?

A. I don't recall his name.

Q. Okay. Was it Mr. Hawkins?

A. It was Mr. Hawkins.

Q. Okay.

A. Thank you.

Q. Yes, sir.

then, that Union Pacific's ownership of these former historic railroads is established in either this NewFields report, Mr. Hawkins' deposition, and/or Mr. Rosasco's report and deposition?

A. Well, I don't believe the NewFields report attributes the railroads to any specific owner. The Rosasco expert report does. And Mr. Hawkins' deposition also spoke as to the individual railroads and their relationship to Union Pacific.

Q. All right. Did you -- did you also see Mr. Rosasco's deposition testimony in this case?

A. I did.

Q. Okay. So you have the benefit of both his report and his deposition testimony?

A. That's correct.

Q. Okay. Do you know whether or not -- well, strike that. Let me start the question again.

Since this draft NewFields report is dated January 29, 2007, it existed before the SEMO settlement was ever agreed to by Asarco, didn't it?

A. That is correct.

Q. Did you see it for the first time in connection with preparing for this deposition?

A. That's correct. This report was prepared for the Doe Run Company.

Q. Okay. So it's not any great revelation that there was railroad hauling of mining materials. Right?

A. That's correct.

Q. Then -- then what additional information did you get from the maps in Mr. Rosasco's information, other than the fact that railroad hauling was an accepted mode of transportation?

A. The maps didn't really give me any additional information other than to show there were a lot of historic railroads in the area.

Q. Did any of the maps that you saw give you any information as to which historic railroads in the area had ultimately been acquired by Union Pacific Railroad?

A. The maps did not.

Q. Did they give you -- did the maps give you any information as to where areas of potential environmental contamination existed on railroad right-of-ways?

A. The maps did not.

Q. Have you looked at information to determine that for the West Fork Mine and the Sweetwater Mine, there was no railroad hauling of mining material?

A. As I recall, there was no railroad close to

Sweet -- I mean, to West Fork.

Q. And isn't the same true, that there was no railroad close to Sweetwater?

A. I don't recall.

Q. Okay. Now, you mentioned having seen some sampling results, and I'm going to hand you what's been previously marked as both Exhibit 19 and Exhibit 48.

(Previously marked Exhibit 19 is attached hereto.)

BY MR. CONNELLY:

Q. Is that one of the sampling results that you have seen before?

A. Yes.

Q. Now, it appears that this one was -- is reported by Teklab, Inc., on November 4, 2013, and if we look through here, it appears to be for -- hold on. I'm trying to be more precise. Well, I guess my first question is going to be, do you know where these samples were taken?

A. I do not know where these samples were taken.

Q. If you turn to the page of Exhibit 19 to page -- what's numbered page 4, not the document number, but the -- and it's actually -- if I may

conditions at the West Fork, Sweetwater, and Glover sites. Did you note that?

A. This report is limited to St. Francois and Madison Counties.

Q. Okay. And it specifically excludes any consideration of historic railroad operations in connection with West Fork, Sweetwater, and Glover, does it not?

A. I think we previously discussed that there were no railroads at West Fork.

Q. Okay. And having read Mr. Rosasco's deposition transcript, you know that he confirmed in his deposition that he offered no opinions regarding Union Pacific's potential liability for West Fork, Sweetwater, and Glover. Do you agree?

A. I agree.

Q. Okay. You have no information to the contrary, do you?

A. I don't.

Q. Okay.

A. I would say that railroads would have serviced the Glover Smelter. Probably --

Q. Okay.

A. -- still do today.

Q. All right. Do you know what railroad?

civil complaint, BNSF Railway is identified as a party. Was there information available to Asarco at the time this complaint was filed which indicated that BNSF was potentially liable for environmental conditions at SEMO?

MR. FOLAND: I object to the question. We're not getting into the liability of other parties or Asarco.

Pursuant to the court order and the objections filed, I'm going to tell you not to answer that.

BY MR. CONNELLY:

Q. Well, just for explanation, I'm trying to determine whether or not information available may have been intended for UP, but was somehow attributed to BNSF. And I'm trying to find out if there was information as to BNSF potential liability that may have been misconstrued or misused and it should have been UP potential liability. So that's why I'm asking the question.

MR. FOLAND: To the extent you can answer that as a -- let me say "amended," although that's not exactly what occurred, that there was information misconstrued as to BNSF related to UP, go ahead.

THE WITNESS: I would have no information

of why they named BNSF.

BY MR. CONNELLY:

Q. Okay. So in -- in May of 2008 when the SEMO settlement was presented to the Court for approval, what was Asarco's position with regard to the potential liability of Union Pacific for the SEMO sites?

A. At that point, we were not investigating third parties at these sites. We were only dealing with parties who had filed proofs of claim.

Q. So is it accurate to say that at the time of the SEMO settlement and its being presented to the bankruptcy court for approval, there had been no consideration of the potential liability of third parties for the SEMO site?

A. I'm not going to -- I'm going to speak in generality here.

Q. Yes, sir.

A. We would have looked internally at what we thought other parties might be involved, but when it came time to negotiate settlements, that really made little difference.

Q. And why do you say it made little difference? I mean, from Asarco's standpoint, why did Asarco believe it made little difference?

A. Because we weren't settling for other parties at these sites. We were only settling for what we felt was Asarco's liability to the parties who had submitted claims, and that was in general, across the board, at all of the sites.

Q. Okay. So would it be accurate to say, then, Mr. Pfahl, that as of the time of the SEMO settlement and the presentation of that settlement to the bankruptcy court for approval, Asarco did not have information as to which third parties, if any, could have potential liability at the SEMO sites?

A. I would say that's a safe characterization.

Q. All right. Well, had there been -- to your knowledge, as the corporate representative, have you seen any indication or heard from any person that any type of investigation into third-party involvement had been conducted at the time of the SEMO settlement?

MR. FOLAND: And, again, not anything that you've been related by counsel.

THE WITNESS: We did not investigate third parties who were not involved.

BY MR. CONNELLY:

Q. Okay. So at what point in time did Asarco begin investigating third parties for potential

liability at the SEMO sites?

A. In the bankruptcy, Asarco reserved the right to get cost recovery from third parties. And once the bankruptcy was finalized late in 2010, I'd say beginning in 2011, the company started looking at other parties at all of the sites.

Q. Okay. In what way do you say Asarco reserved the right to bring claims against third parties? What are you thinking of when you say that was what Asarco intended to do?

A. I think it's somewhere in the settlement documents in the covenants not to sue. We reserved certain rights for contribution from third parties. And I'd have to look at the document and find the specific language.

Q. Well, I'll be glad for you to do that, because I'm interested in knowing what your point -- do you mind if I look at these and bring it to your attention? Is that okay?

A. Yes. Go ahead.

Q. I mean, I'm just trying to facilitate things here.

Right at the bottom of the stack, wouldn't you know it.

I've pulled out Exhibit 35, which is the

Q. Are you going to follow counsel's instruction not to answer that question?

A. I am.

Q. Then let me rephrase the question or pose a different question.

When did Asarco determine that it had evidence of Union Pacific's potential liability to justify bringing a claim for the SEMO sites?

A. I think by May of 2011, Asarco had identified railroads within the area. They named BNSF in the initial complaint, and I believe in the -- what do you call the revised complaint?

Q. It's called the first amended.

A. The first amended complaint, I believe, lists Union Pacific.

Q. Okay. So it's Asarco's position that by the time the original complaint was filed on May 12, 2011, Asarco had enough information to believe that railroads owned and operated in the area could have potential liability for the SEMO sites?

A. That is correct.

Q. Do you know what work had been done to determine which railroads could have potential liability?

A. At that point in time, I don't know what

work was done.

Q. Well, who was doing that within the Asarco organization, was coming up with that information?

A. That was being handled by Greg Evans and the -- and the general counsel.

Q. So counsel was in charge of that effort?

A. That's correct.

Q. Was there anyone within the Asarco organization, other than counsel, who was involved in any investigative effort to identify which railroads, historic or current, could have potential liabilities at SEMO?

A. There was no work done by Asarco.

Q. Was Mr. Robbins engaged in that effort?

A. He was not.

Q. So 100 percent of the information being developed was being developed by counsel?

A. There were typically some attorney-client communications. On sites I've worked on, at some point in time, the attorney -- counsel speaks to the internal person with knowledge.

Q. Well -- and I don't want to get into the - the details of those communications, but what I'm required to ask about is whether or not that involved Asarco personnel in the investigative effort?

seeking attorney-client privileged material.

I'm instructing you not to answer.

BY MR. CONNELLY:

Q. Well, let's talk specifically about Union Pacific. As of the time the original complaint was filed on May 12, 2011, Asarco already had the NewFields report from 2007, did it not?

A. I believe so.

Q. Okay. Had Asarco already seen any of the sampling that had been done at locations evidenced by those samples that we looked at earlier in the deposition? I think Exhibits 19 and 20.

A. At the time of filing of the complaint?

Q. Yes, sir, the original complaint.

A. No. That data was collected after the complaint was filed.

Q. Okay. So since you indicated that the Asarco information regarding UP liability is based upon the NewFields report, the sampling data, and the Rosasco expert report, is there any other information that Asarco had regarding UP's liability at SEMO, other than the NewFields report at the time that the original suit was filed?

A. We would have had a general understanding of materials that were used to construct railroads

and what effect those materials might have on water quality and how that might relate to natural resource damages.

Q. Okay. So whether it was Union Pacific or BNSF, Asarco did have a general understanding of the potential contribution of railroad right-of-ways and materials used to environmental conditions at SEMO?

A. That's correct.

Q. And, of course, that knowledge of the potential contribution of railroad right-of-ways in mining areas to environmental conditions was something that had been known by Asarco for a good while?

A. That is correct.

Q. In fact, your own personal experience on other sites gave you the general working knowledge that the material used for railroad road beds and right-of-ways could well have an environmental impact?

A. That's correct.

Q. Okay. So frankly, if someone had stopped and thought about it at the time of the SEMO settlement, that same information would have been generally available?

A. That's correct.

Q. Okay. Do you know why when the original complaint was filed, Union Pacific was not named as a party?

A. I do not know why.

Q. Did you discuss that with Mr. Aldrich?

A. I did not. I had not seen the original complaint. I'd only seen the amended complaint.

Q. Oh, I see. In your preparation for this deposition, you hadn't seen the original complaint?

A. That's correct.

Q. Okay. At the time of the SEMO settlement in 2008, is it true that Union Pacific was performing railroad operations for Asarco in the SEMO area?

A. I don't think it is true. We had sold our operations prior to that.

Q. All right. So at any time earlier than the SEMO settlement, is Asarco aware of the fact that Union Pacific had provided railroad operations to Asarco facilities in the SEMO area?

A. The Glover Smelter would have had railroad service. I'm not sure by whom.

Q. Okay.

A. Asarco -- the people dealing with traffic in Asarco at the time --

Q. All right.

Q. Yes, sir. I'm actually going to withdraw the question. How's that? Make it easier on both of us.

A. Okay.

(Marked for identification Exhibit 79.)

BY MR. CONNELLY:

Q. I'm going to show you now what is marked as Exhibit 79. This is the first amended complaint. This is a document that you have seen in preparation for your deposition. Right?

A. Yes, I believe so.

Q. And this document indicates that it was filed on September 14, 2011, approximately four months after the original complaint was filed. And as you've identified, UP is identified as a party in this complaint, is it not?

A. That is correct.

Q. Do you know what information was developed between May of 2011 and September of 2011 which led Asarco to add Union Pacific as a defendant?

A. I do not.

Q. Who would know that?

A. Counsel.

Q. Have you seen any documents, Asarco documents, not communications from counsel, which

indicate additional information on Union Pacific's potential liability at SEMO which was developed between May of 2011 and September of 2011?

A. I have seen no documents.

Q. Okay. Did you talk to any Asarco personnel who indicated that in that period of time from May of 2011 to September of 2011, there was additional information developed that indicated UP's potential liability at SEMO?

A. I did not.

Q. Would you agree with me that whatever Union Pacific's potential liability for the SEMO sites was in September of 2011 probably existed in May of 2011 --

MR. FOLAND: Object --

BY MR. CONNELLY:

Q. -- when the lawsuit was filed?

MR. FOLAND: Object to the form of the question. It's calling for speculation on the part of this witness.

BY MR. CONNELLY:

Q. You may answer, Mr. Pfahl.

A. I doubt that Union Pacific's liabilities in the SEMO site have changed any over the last many years.

probably brought -- bought the Ray Mine from them.

Q. Okay. And did that mine operate in generally the same way as the West Fork Mine?

A. Yes. It was an older mine. It's larger, but also, again, it was operated pursuant to permits.

Q. Okay. So what were the environmental issues, other than air permits and water discharge permits, which are more operational permits, what were the environmental concerns about releases of hazardous substances, if any, at the Sweetwater Mine?

A. I would say at Sweetwater Mine, there were none what I would call CERCLA kind of liabilities. Or certain -- I shouldn't use the word "liability" -- but CERCLA-type issues.

Q. Okay. Because you're not aware, from all the information you've viewed, of there being any particular releases of hazardous substances from the Sweetwater Mine?

A. I'm not aware of any releases, and it wasn't a Superfund site.

Q. Okay. All right. So same questions for Sweetwater that I just asked you about West Fork. Even though there was an amount of money from the SEMO settlement allocated to Sweetwater, you don't know specifically how that money was sent -- spent,

I, JOHN CHRISTOPHER PFAHL, do hereby declare that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

_____I have made changes to my deposition.

_____I have NOT made any changes to my deposition.

EXECUTED on this __________ day of

____________,20___, at______________,___________.
(City) (State)

JOHN CHRISTOPHER PFAHL

STATE OF ARIZONA )
COUNTY OF MARICOPA )

CERTIFICATE

I, ROBIN L. B. OSTERODE, Certified Reporter for the State of Arizona and Certified Shorthand Reporter for the State of California certify:

That the foregoing proceeding was taken by me; that I am authorized to administer an oath; that any witness, before testifying, was duly sworn to testify to the whole truth; that the questions and answers were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings, to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto, nor am I in any way interested in the outcome hereof.

DATED this 27th day of March, 2014.

ROBIN L. B. OSTERODE, RPR
CA CSR No. 7750
AZ CR No. 50695