# EXHIBIT 12

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MISSOURI

 3                       EASTERN DIVISION

 4
     ASARCO, LLC,                        )
 5                                       ) Case No.:
              Plaintiff,                 ) 4:11-cv-00864-JAR
 6                                       )
         v.                              )
 7                                       )
     NL INDUSTRIES, INC., et al.,        )
 8                                       )
              Defendants.                )
 9   _____)

10

11

12

13       VIDEOTAPED DEPOSITION OF DONALD A. ROBBINS

14

15

16                     Phoenix, Arizona
                        April 18, 2014
17                         9:05 a.m.

18

19

20

21

22

23
     REPORTED BY:
24   Janice Gonzales, RPR, CRR
     AZ Certified Court
25   Reporter No. 50844
```

**DepoTexas, Inc. / Sunbelt Reporting & Litigation Services**

1   other words, it goes through a flotation process, the
2   metals of value are separated from things like iron
3   and silica and lime, and all of those materials
4   basically go to the tailings while the metals of
5   interest go into what's called the concentrate which
6   goes on to the smelter for processing.
7          Q.   Well, are tailings still a rock, a hard
8   substance?
9          A.   They're more like sand.
10         Q.   Okay.  That's what I was trying to get to
11  is the -- the size and -- and composition of
12  tailings.  So you would say it's a coarse sand-like
13  material?
14         A.   Yes, sir.
15         Q.   Okay.  And to your knowledge, were
16  tailings ever used, in any way, for industrial or
17  other purposes?
18         A.   From West Port -- West Fork, not that I'm
19  aware of.
20         Q.   Okay. And are you aware of -- of whether
21  there were any railroads in the area of the West Fork
22  Mine and Mill?
23         A.   To the best of my knowledge, both from
24  Sweetwater and West Fork, all of the ore was
25  transported to the smelters by truck.

1        Q.   Okay.  So you're not aware of any
2   railroads in the area of West Fork or Sweetwater
3   which may have been used in transportation of
4   material?
5        A.   Not that I'm aware of.
6        Q.   Okay.  And was it ever part of your
7   duties and responsibilities with regard to West Fork
8   and Sweetwater to specifically look for railroads in
9   the vicinity?
10       A.   No.
11       Q.   Were you ever asked in any capacity
12  whether you were still employed by ASARCO or after
13  retirement in your consulting capacity to investigate
14  the location of Union Pacific right-of-ways and
15  railroads in the area of West Fork and Sweetwater?
16       A.   No.
17       Q.   All right.  Now, let me direct your
18  attention to the Sweetwater Mine for a moment.  Was
19  that also a mill?
20       A.   Yes, sir.
21       Q.   Okay.  Was it the same type of operation
22  that West Fork had?
23       A.   Yes.
24       Q.   I'm going to go back to West Fork for
25  just a minute because I want to put some time frame

```
 1    from time to time did occur.
 2         Q.   Well, would it be fair to say that for
 3    both West Fork and Sweetwater, the potential for
 4    wind-blown erosion of the tailings pile was something
 5    that was appreciated?
 6              MR. BELANCIO:  I'm going to object and
 7    instruct the witness not to answer.  We're going to
 8    ASARCO's liability here which is beyond the limiting
 9    order.  If you want to get to questions that -- about
10    UP's potential liability as to the tailings piles,
11    please do so, but I'm going to instruct him not to
12    answer that question.
13              Okay.  And I'm sorry, as a little point
14    of order, Carolyn, could you type a little lighter?
15    I'm sorry, it's just the -- the keys banging is
16    pretty loud and it's start -- starting to distract me
17    a little bit, and I just --
18              MS. MCINTOSH:  I'm sorry, I'll attempt to
19    do so, but...
20              MR. BELANCIO:  I appreciate it.
21    BY MR. CONNELLY:
22         Q.   During the time that you were working for
23    ASARCO and had environmental compliance
24    responsibilities for West Fork and Sweetwater, do you
25    recall ASARCO spending any money to address
```

```
 1   remediation or contamination on any railroad
 2   right-of-ways?
 3        A.   Now, are we talking about --
 4        Q.   West Fork and Sweetwater, in that area?
 5        A.   No, sir.
 6        Q.   Okay.  And we're going to get to this in
 7   more detail, but of course we know that ultimately
 8   ASARCO settled the claims of EPA and the State of
 9   Missouri with regard to West Fork and Sweetwater,
10   correct?
11        A.   Yes, sir.  Yes, sir.
12        Q.   Are you aware of the EPA and the State of
13   Missouri expending any money for response costs
14   connected with any railroad right-of-ways in the area
15   of West Fork and Sweetwater?
16        A.   I am not aware of any.
17        Q.   Okay.  In your consulting capacity,
18   Mr. Robbins, have you been asked to provide any
19   oversight over how the EPA or the State of Missouri
20   is spending ASARCO's settlement money in connection
21   with the response costs in the area of West Fork and
22   Sweetwater?
23        A.   No, sir.
24        Q.   Do you have any personal knowledge of
25   that?
```

```
 1          A.    No, sir.
 2          Q.    Okay.  All right.  Now, let me direct
 3   your attention to the Glover Smelter.  What do you
 4   recall about the history of that smelter in terms of
 5   when it began and ended?  You've already told us it
 6   was sold to Doe Run in '98.
 7          A.    Right.
 8          Q.    So how far back does Glover Smelter go?
 9          A.    It was built in 1968.
10          Q.    Okay.
11          A.    And it was built to handle ores from the
12   New Lead Belt -- Belt as opposed to the Old Lead
13   Belt.
14          Q.    Where is the Old Lead Belt?
15          A.    At St. Francois County in the Catherine
16   Mine.
17          Q.    Okay.  And the New Lead Belt was where?
18          A.    Sweetwater, West Fork, and what's known
19   as the Viburnum Trend.
20          Q.    Okay. So Glover was built to handle ores
21   from the New Lead Belt?
22          A.    That's right.
23          Q.    And never did receive ores from the Old
24   Lead Belt?
25          A.    No, sir.
```

1    A.    Yes.

2    Q.    Okay.  Have you ever been asked to

3 undertake any investigation of railroads in general

4 in the area of the Glover Smelter or Union Pacific

5 railroads in particular?

6    A.    No.

7    Q.    Did you ever make any observations or do

8 you hold any personal knowledge regarding the

9 existence of railroads in the area of the Glover

10 Smelter?

11    A.    No.

12    Q.    Do you know whether or not the Glover

13 Smelter operated its own railroad, an industrial line

14 within the confines of the facility?

15    A.    As I recall, there were tracks within the

16 Glover Smelter that they used for internal moving of

17 concentrate.

18    Q.    So am -- am I -- do I understand that you

19 have no personal knowledge as to what Union Pacific

20 tracks may or may not be in the vicinity of the

21 Glover Smelter?

22    A.    I don't.

23    Q.    And you don't know whether Union Pacific

24 ever serviced that facility in any way?

25    A.    No.

```
 1          Q.   Okay.  Was there ever a time given your
 2   environmental responsibilities where you or your
 3   department ever reported it to the EPA or the State
 4   of Missouri, any release of contaminants from a
 5   railroad right-of-way?
 6          A.   No.
 7          Q.   Are you aware of ASARCO ever spending any
 8   money addressing remediation of contaminants in a
 9   railroad right-of-way in the vicinity of the Glover
10   Smelter?
11          A.   No.
12          Q.   Are you aware of the EPA or State of
13   Missouri ever spending any money response costs
14   addressing contamination on any railroad
15   right-of-ways in the vicinity of the Glover Smelter?
16          A.   No.
17          Q.   And do you have any knowledge as to how
18   the EPA and the State of Missouri may have used --
19   whether they used any of the funds paid by ASARCO in
20   the settlement in connection with remediating
21   conditions on railroad right-of-ways in the area of
22   the Glover Smelter?
23          A.   No.
24          Q.   Mr. Robbins, before your retirement, did
25   you ever have any communications with the EPA or
```

```
 1   State of Missouri concerning environmental conditions

 2   at West Fork?

 3        A.    Not that I recall.

 4        Q.    Same question for Sweetwater.  During --

 5   before your retirement, would you have had any

 6   communications with either the EPA or State of

 7   Missouri concerning environmental conditions at

 8   Sweetwater?

 9        A.    Now, we talked about the proofs of claim

10   that came from the --

11        Q.    Yes, sir.

12        A.    That would be the extent of my --

13        Q.    You're right.  Well, by -- I mean, proofs

14   of claim would have been something they filed --

15        A.    Okay.

16        Q.    -- and you may have become aware of.

17        A.    Okay.  Okay.

18        Q.    What I'm really trying to get to is

19   whether there were any communications you had with

20   those agencies either reporting things or addressing

21   issues they raised where you were directly

22   communicating either in person, by phone, or in

23   writing?

24        A.    No.

25        Q.    Okay.  And same for the Glover Smelter.
```

```
 1   manager for Glover?
 2        A.   What period of time?
 3        Q.   Again, when you had some responsibility.
 4        A.   Okay.
 5        Q.   Some environmental compliance
 6   responsibility.
 7        A.   Curtis Bates.
 8        Q.   All right.  And what years do you
 9   associate with Mr. Bates at the Glover Smelter?
10        A.   '70 -- about '72 to maybe 1990.
11        Q.   And what about up to '98, do you know who
12   the manager would have been during that period?
13        A.   No.
14        Q.   Do you know where Mr. Bates is now?
15        A.   No.
16        Q.   Now, before 1998, did you have any
17   information about the potential for CERCLA liability
18   to arise associated with materials used on railroad
19   right-of-ways?
20        A.   Would you restate that, please?
21        Q.   I'll be glad to.
22             Before 1998 --
23        A.   Okay.
24        Q.   -- did you have any information that
25   materials used on railroad right-of-ways could create
```

```
 1   CERCLA liability for releases of contaminants?
 2        A.   Now, are we talking now about Missouri or
 3   anywhere?
 4        Q.   Well, I'm going to do both.  So which one
 5   would you like to take first?
 6        A.   Well, anywhere, yes, I did.
 7        Q.   Okay.  So how had that information come
 8   to your attention in the first place?
 9        A.   Well, at -- in the East Helena smelter,
10   we were serviced by the railroad and there was a -- a
11   concern there about both the right-of-way and the
12   yard in Helena --
13        Q.   Okay.
14        A.   -- because of the ballast and also the
15   spilled concentrate that was viewed to be an issue.
16        Q.   Okay.  And how did that concern arise in
17   East Helena?
18        A.   Their concern on how -- how to clean it
19   up because there was a potential for human exposure
20   and who was going to pay for it.
21        Q.   How did that come to your attention,
22   Mr. Robbins?
23        A.   Actually, the railroad brought it to my
24   attention.
25        Q.   Okay.  And when was that brought to your
```

```
 1   attention?
 2        A.   I'd say early '90s.
 3        Q.   Okay.  So somewhere in the early '90s,
 4   the railroad which was servicing the East Helena
 5   smelter brought to your attention that there could be
 6   contaminants on the railroad right-of-way that may
 7   create human exposure issues?
 8        A.   Yes.
 9        Q.   How was that addressed in East Helena?
10        A.   We basically said that there were a
11   number of reasons why we didn't think that that was a
12   significant issue.  And furthermore, we felt that
13   since we didn't take title to concentrate until it
14   went through the smelter gates at East Helena, we
15   didn't think that any material in the yard was ours.
16        Q.   Okay.  So what -- did ASARCO spend any
17   money then in connection with the East Helena site to
18   address environmental conditions on the railroad
19   right-of-way?
20             MR. BELANCIO:  I'm going to object that
21   this is beyond the scope of the limiting order and
22   instruct the witness not to answer.
23             MR. CONNELLY:  Well, it concerns UP
24   liability.
25             MR. BELANCIO:  Not in the SEMO sites.
```

```
 1                MR. CONNELLY:  Huh?
 2                MR. BELANCIO:  In the SEMO sites?
 3                MR. CONNELLY:  Well, no, we're talking
 4   about East Helena.
 5                MR. BELANCIO:  Right.
 6                MR. CONNELLY:  And I'm trying to find out
 7   what his knowledge is that may relate to actions
 8   which were material at the SEMO sites.
 9                MR. BELANCIO:  I'm still going to stand
10   on the instruction at this point.
11   BY MR. CONNELLY:
12        Q.   Okay.  Are you going to follow counsel's
13   instruction and not answer that question?
14        A.   Yes, sir.
15        Q.   All right.  Were there any other
16   locations outside of Missouri where you became aware
17   of conditions on railroad right-of-ways which might
18   create environmental liability?
19        A.   Coeur d'Alene, Idaho.
20        Q.   And approximately when did you become
21   aware of that?
22        A.   Somewhere around 1990.
23        Q.   Okay.  Any others?
24        A.   Not that I recall.
25        Q.   All right.  Now, let me direct your
```

1    Q.   Okay.  Now, if I understand your
2  testimony correctly, at the time of the SEMO
3  settlement, you personally and ASARCO as a company,
4  had some historical knowledge that there can be mine
5  tailings and chat used as ballast on railroads?
6         MR. BELANCIO:  Objection; misstates the
7  witness' prior testimony.  You can go ahead and
8  answer.
9         THE WITNESS:  I think -- I think we had
10 knowledge that mining material had been used as
11 ballast.
12 BY MR. CONNELLY:
13    Q.   Yes, sir.
14    A.   Yeah.
15    Q.   And that's because of what you had found
16 out at the East Helena site and at Coeur d'Alene?
17    A.   Right.
18    Q.   So on both those sites, there was some
19 knowledge that mining material had been used as
20 ballast on railways?
21    A.   Right.
22    Q.   So that was known before the SEMO
23 settlement, wasn't it?
24    A.   Yes.
25    Q.   Okay.  And I think you've indicated that

```
 1              I, Donald A. Robbins, do hereby declare
 2   under penalty of perjury that I have read the
 3   foregoing transcript; that I have made any
 4   corrections as appear noted, in ink, initialed by me,
 5   or attached hereto; that my testimony as contained
 6   herein, as corrected, is true and correct.
 7
 8   _____    I have made changes to my deposition.
 9   _____    I have NOT made any changes to my deposition.
10
11            EXECUTED this _____ day of
12   _____, 20__, at _____,
13   _____.              (City)
14        (State)
15
16
17
18                             _____
19                                  Donald A. Robbins
20
21
22
23
24
25
```

```
 1   STATE OF ARIZONA      )
     COUNTY OF MARICOPA    )
 2

 3                       CERTIFICATE

 4         I, JANICE E. GONZALES, Certified Court

 5   Reporter for the State of Arizona, certify:

 6              That the foregoing proceeding was taken

 7   by me; that I am authorized to administer an oath;

 8   that the witness, before testifying, was duly sworn

 9   by me to testify to the whole truth; that the

10   questions propounded by counsel and the answers of

11   the witness were taken down by me in shorthand and

12   thereafter reduced to print by computer-aided

13   transcription under my direction; that review and

14   signature was requested; that the foregoing pages are

15   a full, true, and accurate transcript of all

16   proceedings, all to the best of my skill and ability.

17              That the amount of time used by each

18   party at the deposition is as follows:

19         Michael Connelly, Esq. - 2 hours, 8 minutes

20         Michael Belancio, Esq. - 1 minute

21         Joel Herz, Esq. - 0 minutes

22         Carolyn McIntosh, Esq. - 0 minutes

23         Norton Colvin, Esq. - 0 minutes

24         Maxine Martin, Esq. - 0 minutes

25
```

```
 1                  I FURTHER CERTIFY that I am in no way
 2      related to nor employed by any of the parties hereto
 3      nor am I in any way interested in the outcome hereof.
 4                  DATED this 29th day of April, 2014.
 5
 6
 7                       _____
                         Janice E. Gonzales, RPR, CRR
 8                       Certified Court Reporter No. 50844
                         For the State of Arizona
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```