# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| ASARCO LLC, a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11-CV-00864-JAR |
| | ) | |
| NL INDUSTRIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

On September 12, 2014, this matter came before the Court for hearing on Asarco's prima facie case on its contribution claim under CERCLA § 113(f) against Union Pacific (Doc. No. 214) and Union Pacific's motion for summary judgment. (Doc. No. 220) At the hearing, the Court advised the parties that it would take all pending motions concerning exhibits, expert reports and affidavits with these matters, namely, Asarco's Motion to Exclude Opinions of Union Pacific's Expert Roy P. Farwell (Doc. No. 222), Union Pacific's Motion to Exclude Expert Opinions and Testimony of Asarco's Expert (Doc. No. 224), Union Pacific's Motion to Strike the Declarations of Sidney L. Strickland and Gregory Evans (Doc. No. 248), Asarco's Motion to Strike New Evidence submitted by Union Pacific in its Summary Judgment Reply Brief (Doc. No. 252), Asarco's Motion to Strike Union Pacific's Exhibits and Summaries of Evidence (Doc. No. 266), and Union Pacific's Motion for Leave to file its Demonstrative Exhibits in advance of the Lone Pine Hearing (Doc. No. 272). All pending motions are fully briefed and ready for disposition.

## I.     Background

This is a civil action brought by Plaintiff Asarco LLC ("Asarco") under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601 *et seq.*, for contribution and cost recovery against Defendants NL Industries, Inc. ("NL"), Union Pacific Railroad Company ("Union Pacific"), St. Francois County Environmental Corporation ("SFCEC"), Delta Asphalt, Inc. ("Delta"), and Anschutz Mining Corporation ("AMC") for monies it paid in its settlement with the United States and the State of Missouri regarding its environmental liability at the Southeast Missouri Mining District ("SEMO") sites. Due to the complex nature of the case, the Court entered a Lone Pine modified case management order requiring Asarco to make a prima facie showing on the issue of CERCLA liability. (Doc. No. 147) The Court later clarified for the parties that to establish its prima facie case under CERCLA § 113(f), Asarco must prove that: (i) Defendants fall under one of four categories of "covered persons;" (ii) the site in question is a "facility;" (iii) there was a "release" or "threatened release" of a "hazardous substance" at the facility; and (iv) the release caused it to incur response costs. 42 U.S.C. § 9613(f). (Doc. No. 189)

Delta subsequently settled with Asarco and was dismissed from the case on October 31, 2013. (Doc. No. 170) SFCEC, NL Industries, and Anschutz stipulated to prima facie liability with respect to Asarco's CERCLA contribution claim for purposes of the Lone Pine hearing. (Doc. Nos. 190, 192, 193) At the hearing, counsel for Asarco stipulated on the record that Asarco was limiting its case to St. Francois and Madison Counties and opting not to pursue its contribution claim with respect to the sites in Reynolds and Iron Counties, namely, the West Fork Mine, the Sweetwater Mine, and the Glover Smelter. (Transcript of hearing ("Tr."), Doc. No. 299 at 4:20-5:24)

## II. Lone Pine showing

### A. Evidentiary matters

Before considering the merits of Asarco's claim, the Court must address a number of evidentiary matters raised by the parties in connection with the Lone Pine showing.

### 1. Daubert motions

Asarco offers Paul V. Rosasco, P.E., a geologist, hydrogeologist and civil engineer,[1] as its expert to opine on Union Pacific's prima facie liability under CERCLA. His opinions are summarized as follows:

A.  Union Pacific Railroad owns or its predecessors owned railroad lines within St. Francois and Madison Counties that were used to haul ore and other materials to and from the historic mining sites located in SEMO.

B.  The railroad track ballast and in some instances the grades of these railroad lines were constructed using mining-related waste materials, specifically chat.

C.  Chat contains hazardous substances including cadmium, lead and zinc.

D.  Erosion of and dissolution of metals from the railroad track ballast has resulted in release, or threat of release of cadmium, lead and zinc to surface water and sediment.

E.  The U.S. Environmental Protection Agency has used funds provided by Asarco to conduct response actions to address occurrences of cadmium, lead and zinc in surface water and sediment within St. Francois and Madison Counties.

(Rosasco Report, Doc. No. 214-6 at 3)[2]

---

[1] Rosasco is President and Principal Engineer at Engineering Management Support, Inc. As described by Asarco, Rosasco has over 30 years of experience with CERCLA and National Priorities List (NPL) site projects, as well as prior experience regarding assessment of historic operations at rail yards where operations caused contamination requiring remediation. (Rosasco CV, Doc. No. 214-6 at 28) He has been qualified by several federal courts as an expert in the areas of hydrogeology, contaminant occurrence, fate and transport, remedial action technologies, site remediation, costs of remedial actions and consistency of site investigations, and remedial actions with the National Contingency Plan. (Rosasco Report, Doc. No. 214-6 at 4-5)

[2] Asarco submitted a second declaration by Mr. Rosasco in support of its response in opposition to Union Pacific's motion to exclude (see Doc. No. 232), which Union Pacific also seeks to exclude. (Doc. No. 224 at 2 n.1)

Union Pacific disclosed railroad attorney Roy P. Farwell, J.D.,[3] to rebut Rosasco's opinion with respect to ownership and control of railroad lines within St. Francois and Madison Counties and legal succession. He opines as follows:

Opinion 1 - Railroad Rights of Way in Missouri are normally easements that terminate with abandonment of rail use. The rights of way involved in the lines discussed in this opinion are consistent with this. Abandonment occurs when the railroad evidences an intention to discontinue rail service with no prospect of resumption. Upon abandonment the then unencumbered ownership lies with the underlying fee holder, typically the owners of the adjacent property.

Opinion 2 -- Neither [Union Pacific] nor any of its corporate predecessors ever owned property within what are now known as the SEMO Sites.

Opinion 3 -- There are major breaks in corporate successorship even on lines that [Union Pacific] or predecessors owned or operated, which serve to cut off potential liability.

Opinion 4 -- There were periods of time when one or more of the relevant railroads did not have control over its operations.

Opinion 5 -- There are periods of time when other entities accepted responsibility for liabilities arising out of rail operations.

(Farwell Report, Doc. No. 222-2 at 1-2)

Both sides have moved to exclude the testimony of each other's experts. Asarco argues that Mr. Farwell's opinions are outside the scope of proper rebuttal (see Doc. No. 222 at 7-9) and contain improper legal conclusions. (Id. at 10-12) Union Pacific argues that Mr. Rosasco's opinions, particularly regarding ownership of SEMO rights of way ("ROW"), are outside the scope of his expertise. (Doc. No. 224 at 4-5) Union Pacific also argues that Mr. Rosasco's

---

[3] Farwell was employed by Union Pacific as in-house counsel from 1978 to 2012. (Farwell CV, Doc. No. 222-2) During his 34-year tenure, a significant and regular part of his work involved determining the history, ownership and operators of railroad properties in the State of Missouri, and particularly those of Union Pacific Railroad Company, Missouri Pacific Railroad Company and their affiliates and predecessors. (Id.) To accomplish this, he evaluated historic property records, corporate records, railroad internal records, court, legislative and administrative agency proceedings, and various other published and unpublished sources.

opinions based on ballast samplings conducted by Asarco and environmental lab NewFields should be excluded as unreliable because without knowledge of the sampling locations or methodology, the results cannot be verified, reproduced or tested. (Id. at 6-9, 12-15)

As a threshold matter, the parties disagree on the extent of the Daubert analysis at the Lone Pine stage of this case.[4] Relying on In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604 (8th Cir. 2011), Asarco maintains that Lone Pine expert reports are intended to be a preliminary showing that a case potentially has merit and that an exhaustive Daubert inquiry is not required, particularly before completion of merits discovery. (Doc. No. 230 at 2-4) In Zurn Pex, the Eighth Circuit concluded that a full Daubert analysis would have been "impractical" because the parties had engaged in bifurcated discovery, resulting in a limited evidentiary record at the class certification stage that would have "prevented … [a] full and conclusive Daubert inquiry." 644 F.3d at 612-13. See also In re Vioxx Products Liability Litig., 2012 WL 1398622, at *4 (E.D.La. April 23, 2012), where the court noted that Lone Pine case-specific expert reports were not intended to be polished expert witness reports compliant with Rule 702 and capable of withstanding Daubert scrutiny.

In contrast, Union Pacific argues that the prima facie posture of a case subject to a Lone Pine order does not permit the skirting of accepted procedure concerning expert testimony and that a full Daubert analysis is required. (Doc. No. 235 at 3-4) Union Pacific cites to Avila v.

---

[4] Not all courts apply the Daubert standard, and some courts explicitly require only a basic prima facie showing without substantiation by experts. See Tatum v. Pactiv Corp., 2007 WL 60931, at *1 (M.D. Ala. Jan. 8, 2007) (requiring plaintiffs to answer Lone Pine questionnaire to the extent that they individually had knowledge on its subjects, but not requiring substantiation by experts); Hernandez v. Super. Ct., 112 Cal. App. 4th 285, 296-302 (Cal. Ct. App. 2d Dist. 2003) (requiring plaintiffs to supply the relevant facts of their injury and the facts that each plaintiff would rely upon for causation, but not requiring substantiation by experts because of a state statute that prevented trial courts from ordering a unilateral disclosure of experts). See also David B. Weinstein, Managing the Complex: A Brief Survey of Lone Pine Orders, 34 Westlaw Journal Environmental 1 (2013).

Willits Envtl. Remediation Trust, 633 F.3d 828 (9th Cir. 2011). In Avila, the court excluded an expert report rendered pursuant to a Lone Pine order on the grounds that the expert lacked necessary expertise, failed to show causation and because his opinions were unreliable. Id. at 838-39.

The purpose of a Daubert motion is to ensure that only reliable and relevant expert testimony is presented to a jury. Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012). Thus, the usual concerns of Daubert are not present in a case where, as here, the district judge sits as the trier of fact in place of a jury. See Zurn Pex, 644 F.3d at 613 (quoting United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). The Court believes that some limited Daubert analysis is appropriate at this stage for purposes of determining whether Asarco has established its prima facie case, but will in its discretion apply a more relaxed Daubert standard for admitting the testimony. See Tussey v. ABB, Inc., 746 F.3d 327, 337 (8th Cir. 2014) ("In a bench trial, we not only give the trial court wide latitude in determining whether an expert's testimony is reliable, we also relax Daubert's application.") (internal quotation marks and citations omitted). See also David E. Watson, P.C. v. U.S., 668 F.3d 1008, 1015 (8th Cir. 2012).

Generally, expert testimony is admissible when it is reliable and will assist the trier of fact. See Fed.R.Evid. 702. The Court is entitled to substantial discretion in determining whether expert testimony should be allowed. Russell, 702 F.3d at 456. If the Court is satisfied with the expert's knowledge, skill, experience, training, or education, "and the expert's testimony is reasonably based" on that expertise, "the court does not abuse its discretion by admitting the testimony." Weitz Co. v. MH Washington, 631 F.3d 510, 527 (8th Cir. 2011) (quoting United

States v. Kenyon, 481 F.3d 1054, 1061 (8th Cir.2007)); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-91 (1993). Furthermore, mere disagreement with assumptions and/or methodology does not warrant exclusion of expert testimony. Normally, questions regarding the factual bases and underpinnings of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility, which should be left for the fact-finder's consideration. See, Watson, P.C. v. United States, 668 F.3d 1008, 1014-15 (8th Cir. 2012).

After careful review of the materials submitted by the parties, the Court finds both Mr. Rosasco and Mr. Farwell have the requisite knowledge and expertise on which to base their opinions. Mr. Rosasco has over 30 years of professional experience with CERCLA and National Priorities List (NPL) site projects; Mr. Farwell has a 34-year tenure with Union Pacific working on railroad land ownership and control issues in Missouri. Both their reports are carefully researched, detailed and relevant. The Court will, therefore, exercise its discretion and deny the motions to exclude. The Daubert issues in this case are matters for the Court to consider in terms of weighing the testimony and reports of the parties' proposed experts as opposed to finding the evidence so unreliable that it should not even be considered. Bonner v. ISP Tech., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).

### 2. Union Pacific's demonstrative exhibits

On September 8, 2014, Union Pacific filed a notice with the Court that it would use demonstrative aids in support of its argument at the Lone Pine hearing and attached specific examples and descriptions of those aids, including maps, photographs, tables, and charts. (Doc. No. 264) Asarco objected to Union Pacific's notice because it failed to disclose the actual demonstrative exhibits, offering instead only "examples" of the types of evidence it might offer at the hearing which were too vague to afford it adequate notice to examine the exhibits. (Doc.

No. 267) Asarco also objected on the grounds that Union Pacific's exhibits were not timely disclosed pursuant to the Court's August 13, 2014 order requiring the parties file their exhibits to be offered in evidence at the Lone Pine hearing no later than September 8, 2014. (Doc. No. 246) Union Pacific responded by seeking leave to file its demonstrative exhibits in advance of the hearing, specifically a PowerPoint presentation (Doc. No. 272-1) and other visual aids consisting of demonstrative maps. (Doc. No. 272-2) Asarco objected to Union Pacific's use of these exhibits during the September 12 hearing. (Tr. at 27:23-28:24) The Court allowed Union Pacific to use them, and Asarco renewed its objections in a later filed memorandum in opposition to Union Pacific's motion for leave to file its demonstrative exhibits. (Doc. No. 284)

The Rules of Evidence are silent on the use and admissibility of "demonstrative" exhibits. Nevertheless, the Eighth Circuit has explained that district courts have "virtually unfettered discretion to regulate the use of … non-evidentiary devices, either generally or to achieve procedural fairness and regularity in a particular case." United States v. Crockett, 49 F.3d 1357, 1362 (8th Cir. 1995). The use of charts, diagrams, and other visual aids to summarize other evidence is generally permissible in the sound discretion of the trial court, particularly when used to organize complex testimony or transactions for the fact finder, which in this case is the district judge. See United States v. Caswell, 825 F.2d 1228, 1235 (8th Cir.1987).

Asarco has not formulated specific objections to Union Pacific's demonstrative materials or provided any specific deposition testimony it would have cross-designated had it been afforded access to Union Pacific's demonstrative exhibits at an earlier time. Thus, the Court finds Asarco was not prejudiced by those exhibits. Accordingly, the Court will grant Union Pacific's motion for leave to file its demonstrative exhibits and overrule Asarco's objections thereto.

### 3. Union Pacific's summaries of evidence

Union Pacific also filed several Notices of Filing Exhibits offering into evidence the exhibits it was relying on in support of its response to Asarco's Lone Pine brief and summary judgment motion. (Doc. Nos. 253, 255, 256, 260, 264) In addition, Union Pacific filed a number of Summaries of Evidence pursuant to Federal Rule of Evidence 611. (Doc. Nos. 254, 257, 258, 259, 261, 262, 263) Asarco moves to strike Union Pacific's exhibits and summaries, arguing first that pursuant to E.D.Mo. L.R. 4.01 and Rule 6(c)(2), "new documents" submitted either in support of or in opposition to a motion must be filed at the time the motion or opposition is filed. (Doc. No. 266 at 4-5) Asarco further argues that the Court's August 13 Order addressing scheduling and procedures for the Lone Pine hearing did not provide for "summaries" of evidence, which Asarco characterizes as "surreplies in disguise" (see Doc. No. 266 at 10), or the filing of "new" exhibits. (Id. at 4-5) Asarco complains these late and unauthorized submissions have denied it any notice to meaningfully respond or rebut this evidence in its Lone Pine reply brief.

Union Pacific responds that the documents are not "new"; rather, they include documents cited by its expert Mr. Farwell, whose report is in the record, as well as documents produced by Asarco. (Doc. No. 281 at 3-4) Further, its summaries of evidence were not presented as admissible evidence, but rather as a "pedagogical aid" to the Court in identifying, among volumes of documents already submitted, the specific evidentiary details in the record that support its motion for summary judgment. (Id. at 4-5)

The Court did not limit the parties' exhibit submissions to certain types of evidence. (See Doc. No. 246) Moreover, upon review, the Court finds Union Pacific's exhibits are not "new" in the sense that they have all been referenced in Union Pacific's briefing. District courts enjoy

"wide discretion in ruling on the admissibility of proffered evidence." U.S. Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689–90 (8th Cir. 2009). To the extent Union Pacific's summaries can assist the Court in organizing the underlying evidence of record, the Court will consider them and give them the weight they deserve. Accordingly, Asarco's objections to Union Pacific's exhibits and summaries will be overruled and its motion to strike will be denied.

### B.      Prima Facie Liability under CERCLA

To establish a prima facie claim for CERCLA liability, a plaintiff suing under either § 107(a) or § 113(f)(1) must establish that:

> i. the defendant falls under one of four categories of "responsible persons;"
>
> ii. the site in question is a "facility;"
>
> iii. there was a "release" or "threatened release" of a "hazardous substance" at the facility; and
>
> iv. the release caused the plaintiff to incur response costs.

42 U.S.C. §§ 9607(a), 9613(f); Control Data Corp. v. S.C.S.C. Corps., 53 F.3d 930, 934 (8th Cir. 1995); Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc., 925 F. Supp. 624, 629 (E.D. Mo. 1996). CERCLA is a strict liability statute, and plaintiffs are not required to prove causation or fault. 42 U.S.C. § 9607(a); Farmland Industries, Inc. v. Morrison-Quirk Grain Corp., 987 F.2d 1335, 1339 (8th Cir. 1993).

A CERCLA contribution plaintiff is not required to prove its case with "mathematical precision" or "scientific certainty;" rather, it must prove its right to contribution by a preponderance of the evidence. See Georgia-Pacific Consumer Products LP v. NCR Corp., 980 F.Supp.2d 821, 829 (W.D. Mich. 2013) (citing Kalamazoo River Study Group v. Rockwell Intern. Corp., 355 F.3d 574, 590 (6th Cir. 2004)). This burden can be met with or without "direct"

documentary evidence. Id. (citing Tosco Corp. v. Koch Indus., Inc., 216 F.3d 886, 892 (10th Cir.2000) ("CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence.")).

CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment. The Court must therefore construe the statute "liberally to avoid frustration of the beneficial legislative purposes." U.S. v. Mallinckrodt, Inc., 2006 WL 3331220, at *3 (E.D.Mo. Nov. 15, 2006) (internal quotation omitted).

### 1. Covered persons

CERCLA identifies four classes of responsible persons subject to liability for cleanup costs: (1) the current owner and operator of a facility;[5] (2) previous owners and operators who owned or operated the facility at the time of disposal of hazardous substances; (3) any person who arranged for disposal or treatment of hazardous substances at the facility; and (4) any person who transported hazardous substances to the facility. 42 U.S.C. § 9607 (a)(1)-(4). Showing that a defendant is within just one of these categories is sufficient to establish liability. Control Data, 53 F.3d at 934 ("[I]n order to prove liability, a plaintiff must show that a defendant is within one of the four classes of covered persons …"). Asarco contends that Union Pacific is liable under §§ 9607 (a)(1) and (a)(2) as a current operator (Doc. No. 214 at 6-10), a former owner/operator (id. at 10-12), and a successor to former owner/operators. (Id. at 13-16)

Union Pacific currently operates four segments of rail lines in St. Francois County: the "Monsanto segment;" the "Bonne Terre Branch segment;" the "Ste. Genevieve Line segment;"

---

[5] Although § 9607(a)(1) is written in the conjunctive ("the owner *and* operator of a facility"), it has been interpreted in the disjunctive. See, e.g., Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Trust, 32 F.3d 1364, 1367 (9th Cir.1994); Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 328 (2d Cir.2000) (stating that "owner" liability and "operator" liability are "two statutorily distinct categories of potentially responsible parties.").

and the "Desoto Subdivision segment." (Rosasco Report at 7; Deposition of John Hawkins ("Hawkins depo."), Doc. No. 214-10 at 36:21-37:19; Declaration of John Hawkins ("Hawkins Decl.") at ¶ 6; Exhibits 73 and 71 to Hawkins depo., Doc. Nos. 214-11, -12)

In addition, Union Pacific formerly operated seven lines across four counties directly and through predecessor railroads. (Rosasco Report, Att. 3, Fig. 1 - Locations of Existing and Historic Rail Lines (Doc. No. 214-7)) Union Pacific operated the Bonne Terre Industrial Lead Line, a 1.1 mile segment in Bonne Terre, Missouri, until its abandonment in 2001 (Hawkins depo. at 38:6-15; Exhibit 69 to Hawkins' depo., Doc. No. 214-14; Combined Environmental and Historic Report, Doc. No. 214-15 at 13-19), and through its merger with Missouri Pacific Railroad Company ("Missouri Pacific") in 1982, assumed all obligations and liabilities of Missouri Pacific as if Union Pacific itself had incurred them. (Deposition of Robert Grimaila ("Grimaila depo."), Doc. No. 214-9 at 183:5-21; Articles of Merger of Missouri Pacific Railroad Company with and into Union Pacific Railroad Company, Doc. No. 214-6 at 3) Missouri Pacific operated the Belmont Branch, which runs from Bismarck in St. Francois County through Fredericktown and Marquand in Madison County to the eastern Madison County Line, from 1917 until it abandoned the line in 1972. (Rosasco Report at 5; Hawkins depo. at 18:2-7; 21:17-19; 86:9-23)

Union Pacific also assumed the liabilities of companies that Missouri Pacific had previously acquired, which, according to Asarco, encompasses "nearly all" of the companies that owned and operated the rail lines throughout Southeastern Missouri during the past 150 years, i.e., the Mississippi River and Bonne Terre Railway, Missouri Illinois Railroad Company ("Missouri Illinois"), Illinois Southern Railroad ("ILS"), and the St. Louis Iron Mountain and Southern Railway Company ("SLIMS"). (SEMO Settlement Agreement, Doc. No. 214-3 at 5-6;

Exhibit 61 to Hawkins' depo., Doc. No. 214-17 at 2; Rosasco Report at 6-7; Hawkins depo. at 39:13-40:11; 46:8-19; 110:2-13) These companies constructed, operated, and maintained multiple rail lines in St. Francois and Madison Counties, beginning in the mid-1800s.[6] (Rosasco report at 4; Deposition of Franklin Brown ("Brown depo."), Doc. No. 214-21 at 66:9-21)

According to Asarco's expert's report, ballast samplings conducted by Asarco in November 2013 and by environmental lab NewFields in St. Francois County in November 2006 document elevated levels of lead, cadmium and zinc throughout the lines currently operated by Union Pacific as well as the lines formerly operated by Union Pacific and its predecessors. (Rosasco Report at 10-12; "Historic Railroads, St. Francois County Mine Areas Report" prepared by NewFields in 2007 ("NewFields Report"), Doc. No. 214-13) Cadmium, lead and zinc have been designated as hazardous substances by the EPA. See 40 C.F.R. § 302.4. The ratios of zinc to cadmium in railroad ballast sampled by NewFields and Asarco are comparable to those in mill waste from the six mining waste piles in St. Francois County. (Rosasco Report at 12)

Union Pacific argues that Asarco cannot meet its prima facie burden first because it is neither a current nor former owner of property in the SEMO mining district; all ROW in Missouri are held as easements, and easement owners are legally distinct from owners in fee. Further, Union Pacific cannot be liable as a current owner for any abandoned railroad lines as those have reverted to the original fee simple owners upon abandonment. (Doc. No. 223 at 14-16) Assuming, without deciding, that Union Pacific never owned property in the SEMO district, Union Pacific can still be a covered person since CERCLA liability may turn on *operation* as

---

[6] SLIMS constructed the Belmont Line in 1869 through St. Francois and Madison Counties. (Rosasco Report at 6-7; Doc. No. 214-17) Missouri Illinois had operating rights at the Lead Belt Railroad that

well as ownership. Mr. Rosasco identified Union Pacific as still using certain rail lines in SEMO and this opinion is clearly supported in his report. (Rosasco Report at 10-11) Moreover, there is no question that Union Pacific operated over the subject property.

Second, Union Pacific asserts that Asarco has presented no evidence of hazardous substances on the active segments, none of which are within or in close proximity to the SEMO sites. (Doc. No. 223 at 16-18) As discussed below, the term "facility" has been broadly construed to include "virtually any place at which hazardous wastes have been dumped, or otherwise disposed of." United States v. Northeastern Pharmaceutical & Chemical Co., Inc., 810 F.2d 726, 743 (8th Cir. 1986). Asarco has submitted evidence that Union Pacific operated rail lines in SEMO that were adjacent to three tailings piles in St. Francois County, namely, North Bonne Terre, Leadwood, and Columbia Mine, which is near Flat River. (Hawkins depo. at 47:14-16; 49:5-13) Further, track ballast sampling documents elevated levels of lead, cadmium, and zinc within the category of locations the EPA has identified for cleanup through Asarco's SEMO settlement payment. (Rosasco Report at 11-12)

As for evidence of hazardous substances on the active segments, Asarco relies on the NewFields Report, which summarizes and reports "the assessment of the nature and extent of mine-related materials associated with historic railroad beds in St. Francois County." (Doc. No. 214-13 at 1) The NewFields Report found that approximately 1.3 million cubic yards of rail ballast exists within a rail distance of 30.3 miles. (Id. at 10) (By comparison, there are approximately 39.3 million cubic yards of chat and tailings in the six large piles in the County.) (Id.) The measured lead concentration in most of the ballast samples was at the high end of the

provided service to the St. Joe Lead Federal Plant. (Hawkins depo. at 74:26-75:23; Exhibit 58 to Hawkins depo. at 15)

range for chat in St. Francois County. Measured cadmium concentrations were variable but within the range reported for St. Francois County, and zinc concentrations were comparable to mill waste from the National, Bonne Terre and Federal minings tailings piles. (Id.) Using the calculus applied in the NewFields Report, Asarco asserts that 5.4 million cubic yards of mining waste chat are present on Union Pacific's rail lines in St. Francois County, which represents at least 12% of the total mining waste or chat in the County. (Doc. No. 214 at 9) Asarco is not required to prove its case with "scientific certainty." Kalamazoo, 355 F.3d at 590 (6th Cir. 2004). Based on the record submitted, the Court finds Asarco has demonstrated by a preponderance of the evidence the presence of hazardous substances on the ROWs.

Next, Union Pacific argues it is not a past owner or operator of any SEMO ROW because it neither owned nor operated railroads in St. Francois and Madison Counties at the time Asarco claims the lines were constructed with mining waste as ballast, and because the "passive migration" of hazardous substances into the environment is not a "disposal" for purposes of owner/operator liability under CERCLA. (Doc. No. 223 at 18-21)

This class of liable persons under § 107(a)(2) has been interpreted to include parties who were not actively involved in the disposal of hazardous substances at a site but who owned or operated a site *after* the hazardous substances had initially been disposed of. In Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 844 (4th Cir. 1992), for example, the Fourth Circuit held such a party liable under § 107(a)(2) because of leaks from an underground storage tank that was still in existence on-site during its ownership, even though the landowner never used it. In so holding the court rejected the district court's conclusion that "disposal" under CERCLA requires "affirmative human conduct." Several courts have relied on that ruling to hold such parties liable for the spread of historical contamination through soil or groundwater. See,

e.g., State of N.Y. v. Almy Bros., Inc., 866 F.Supp. 668, 676-77 (N.D.N.Y. 1994); CPC International, Inc. v. Aerojet-General Corp., 759 F.Supp. 1269, 1278 (W.D. Mich. 1991); Stanley Works v. Snydergeneral Corp., 781 F.Supp. 659, 6662-64 (E.D.Cal. 1990).[7]

Fourth, Union Pacific argues it is not a successor to the entities that constructed the rail lines and allegedly deposited waste because various transactions between Union Pacific's predecessors constituted asset purchases and/or did not otherwise transfer CERCLA liability. (Doc. No. 223 at 21-22) The ROW in St. Francois and Madison Counties at issue for purposes of past owner/operator analysis includes the Belmont Branch, the Ste. Genevieve Line, the DeSoto subdivision and the MRBT historic lines. SLIMS and ILS constructed the Belmont Branch, Ste. Genevieve Line and DeSoto subdivision. Because both entities were subsequently dissolved and their assets acquired by other entities, Union Pacific contends they are not predecessor entities. As for MRBT historic lines, any interest that Union Pacific or its alleged predecessors had or have in former MRBT ROW is the result of a limited asset purchase in 1945, when MRBT dissolved. Thus MRBT is also not a Union Pacific predecessor entity. (Farwell Report at 7)

The effect of these transactions between Union Pacific's predecessors is not, however, dispositive of Union Pacific's prima facie liability as a current and/or former owner and operator in its own right, or as a successor to Missouri Pacific, which would be liable for its own historical operations in any event. Again, Asarco only needs to show that Union Pacific is within one of four classes of persons subject to the liability provisions of § 107(a).

---

[7] One authority notes the recent trend in the case law has been to reject the rationale of Nurad and hold that the mere migration of previously disposed materials does not constitute disposal. 11 Bus. & Com. Litig. Fed. Cts. § 128:8 (3d ed.) (and cases cited therein). In any event this is not dispositive because Asarco only has to establish that Union Pacific is within one of the four classes of covered persons under § 107(a).

Finally, Union Pacific points to the numerous industrial rail lines servicing SEMO mining facilities in St. Francois and Madison counties that were privately owned and operated by mining companies and argues that liability for the most heavily contaminated historic ROW rests with the mining companies. (Doc. No. 223 at 23) This would be an issue for the allocation of liability phase, where the only question is the extent to which a defendant's liability may be offset by the liability of another. U.S. v. Hercules, Inc., 247 F.3d 706, 718 (8th Cir. 2001).

In sum, the Court finds that Asarco has established by a preponderance of the evidence that Union Pacific is liable as a "responsible person" under §§ 107(a)(1) and (a)(2) based on its current and prior operations within SEMO. This finding is consistent with the mandate that courts construe CERCLA's provisions broadly. See Westfarm Assoc. Ltd. P'ship v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir.1995) ("CERCLA is a comprehensive remedial statutory scheme, and [ ] the courts must construe its provisions liberally to avoid frustrating the legislature's purpose.").

## 2.    Facility – railroad ROW

CERCLA defines "facility" as any site or area where a hazardous substance is located. § 9601(9)(B). The term "facility" is broadly construed to include "virtually any place at which hazardous wastes have been dumped, or otherwise disposed of." Northeastern Pharmaceutical, 810 F.2d at 743 (quoting United States v. Ward, 618 F. Supp. 884, 895 (E.D.N.C. 1985) (roadsides where hazardous waste was dumped were "facilities")). Asarco asserts it has met its burden by presenting evidence of contamination within the St. Francois and Madison County sub-sites. (Doc. No. 214 at 17)

In response, Union Pacific argues that Asarco's evidence of release is neither reliable nor relevant. (Doc. No. 223 at 12-13, 24-29) The Court has considered this argument in connection

with Union Pacific's motion to exclude the opinion testimony and report of Asarco's expert Mr. Rosasco and rejected it. As discussed above, Union Pacific's disagreement with Mr. Rosasco's assumptions and/or methodology does not warrant exclusion of his testimony. At this stage of the proceeding, the Court has considered Mr. Rosasco's opinion and given it the weight it deserves.

Further, the fact that the EPA has not yet addressed contamination of railroad ROW is not dispositive. The EPA has indicated its awareness of the lead contamination present in abandoned rail lines in Southeast Missouri and that it has a strategy in place to address this contamination. At this time, however, it is concentrating its focus on addressing the risk to human health. (EPA letter, Doc. No. 214-26)

Again, Asarco is not required to prove its claim with scientific certainty. CERCLA liability may be assessed on circumstantial evidence. Georgia-Pacific, 980 F.Supp.2d at 829. The preponderance of available evidence documents levels of lead and other heavy metals throughout the lines currently operated by Union Pacific and throughout the lines formerly operated by Union Pacific and its predecessors. Thus, the Court finds Asarco has established that railroad ROWs fall within the meaning of "facility" for CERCLA purposes.

### 3.     Release or threatened release

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment… " 42 U.S.C. § 9601(22). Union Pacific argues that even if the Asarco and NewFields samplings are valid and relevant, Asarco has not demonstrated that the ballast constitutes a "measurable release." (Doc. No. 223 at 24 n.36) This argument is unavailing. Asarco is not required to present a minimum amount of hazardous substances released from

Union Pacific's rail lines to establish its prima facie case. <u>Johnson v. James Langley Operating Co., Inc.</u>, 226 F.3d 957, 962 (8th Cir. 2000).

Moreover, as discussed above, sampling results and expert testimony demonstrate a release or threat of release of hazardous substances by Union Pacific and its predecessors within SEMO. (Rosasco Report at 16-17) Ballast used to construct rail lines within St. Francois County and Madison County consisted exclusively or predominantly of chat. (<u>Id</u>. at 8) According to Asarco's expert, there have been releases or threatened releases of lead, cadmium, and zinc from railroad facilities through physical erosion and chemical leaching. In addition, wrecks and derailment of trains hauling ore, chat and other materials from the various mines in SEMO during historical operations resulted in releases to the environment. (<u>Id</u>. at 19-20)

Testing by NewFields of ballast from abandoned ROW at Bonne Terre in St. Francois County and railroad ballast from locations formerly owned by Union Pacific along the abandoned Missouri Pacific line on City of Fredericktown property in Madison County demonstrates that the heavy metals present in Union Pacific's abandoned rail beds leach into the environment and nearby waterways. (Rosasco Report at 11-12, 16) The EPA reported high levels of lead, cadmium, and zinc in multiple studies throughout St. Francois and Madison Counties. (<u>See</u> EPA Site Description for the Big River Mine Tailings/St. Joe Minerals Corporation Site, Doc. No. 214-4; EPA Site Description for the Madison County Mines Site, Doc. No. 214-5) Thus, the Court finds Asarco has established a "release" or "threatened release" of a "hazardous substance" for CERCLA purposes.

### 4.    Response costs

Response costs must be caused by an actual or threatened release. <u>Johnson</u>, 226 F.3d at 963 (citing <u>General Elec. Co. v. Litton Indus. Automation Sys., Inc.</u>, 920 F.2d 1415, 1417 (8th

Cir.1990)); 42 U.S.C.A. § 9607(a)(4). "[T]he causation requirement does not include an unstated quantitative threshold. Rather, it requires that plaintiffs prove either that there was a release of hazardous substances, or that such a release was threatened." <u>Johnson</u>, 226 F.3d at 963. As discussed in detail above, Asarco has established, by a preponderance of the evidence, releases of cadmium, lead, and zinc from locations where Union Pacific operated facilities within SEMO. Moreover, according to the EPA Site Description for the Madison County Mines Site dated March 26, 2010 (<u>see</u> Doc. No. 214-5 at 5), Asarco bankruptcy settlement money will be used for cleanup of mine wastes.

Union Pacific argues that Asarco must demonstrate a "causal nexus" between any release attributable to Union Pacific and Asarco's response costs as an element of its prima facie case. (Doc. No. 223 at 8-12) In support of this argument, Union Pacific relies on <u>United States v. Dico, Inc.</u>, 136 F.3d 572, 578 (8th Cir. 1998) and <u>Control Data</u>, 53 F.3d at 935. In both opinions, however, the court noted the Eighth Circuit has not addressed the *degree* of connection necessary in such a case. <u>Dico</u>, 136 F.3d at 578; <u>Control Data</u>, 53 F.3d at 935 n.8.

Asarco maintains it need not establish how Union Pacific's releases "caused" its response costs, citing <u>Hercules, Inc.</u>, 247 F.3d 706. (Doc. No. 214 at 21) Once the connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), "it is enough that response costs resulted from 'a' release or threatened release–not necessarily the defendant's release or threatened release." <u>Id</u>. at 716. Asarco "need not trace or 'fingerprint' [Union Pacific's] wastes in order to recover under CERCLA." <u>Id</u>.

Courts that have considered the role of causation in a prima facie case of CERCLA liability overwhelmingly hold that a CERCLA plaintiff need not establish a direct causal link

between the defendant's waste and plaintiff's response costs. See, e.g., United States v. Alcan Aluminum Corp., 990 F.2d 711, 721 (2nd Cir. 1993) ("Alcan II"); United States v. Alcan Aluminum Corp., 964 F.2d 252, 264–66 (3rd Cir.1992) ("Alcan I"); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1152–54 (1st Cir.1989); United States v. Monsanto, 858 F.2d 160, 168–71 (4th Cir.1988), cert. denied, 490 U.S. 1106 (1989); State of New York v. Shore Realty Corp., 759 F.2d 1032, 1042–47 (2nd Cir.1985). To establish liability under § 113(f), it is sufficient for the plaintiff to establish a connection between a particular defendant and the incurred response costs vis a vis the defendant's identification as a responsible person as defined in § 107(a). See Control Data Corp, 53 F.3d at 935 n. 8; General Electric Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1417-18 (8th Cir. 1990) (courts look only to see if there has been a release or threatened release for which a defendant is responsible).

There is evidence in the record of elevated levels of cadmium, lead and zinc in locations where Union Pacific operated facilities within SEMO. This certainly is circumstantial evidence that Union Pacific caused some contamination at the SEMO sites, for which Asarco has incurred or will incur response costs.

**Conclusion**

In summary, the Court concludes that Asarco has met its burden to establish Union Pacific's prima facie CERCLA liability by demonstrating first that Union Pacific, through its own direct operations and as a successor, is a current and former owner/operator of rail lines from which hazardous substances, i.e., lead, cadmium, and zinc, were released in St. Francois and Madison Counties. Second, Asarco has shown these rail lines constitute facilities because hazardous wastes were disposed there historically and have not been remediated. Third, there have been and are releases and the continuing threat of releases in Francois and Madison

Counties at SEMO. Finally, Asarco incurred response costs at SEMO. The Court's conclusion is consistent with the mandate that courts construe CERCLA's provisions broadly to avoid frustrating the remedial purpose of the statute. <u>Westfarm Assoc.</u>, 66 F.3d at 677.

### III. Union Pacific's motion for summary judgment

### A. Evidentiary matters

Before considering the merits of Union Pacific's motion for summary judgment, the Court addresses Union Pacific's motion to strike the Declarations of Sidney L. Strickland, Jr. and Gregory Evans filed by Asarco in support of its opposition to Union Pacific's summary judgment motion, and Asarco's motion to strike "new evidence" submitted by Union Pacific in its summary judgment reply brief.

### 1. Declarations

In support of its opposition to Union Pacific's motion, Asarco submitted declarations from Sidney L. Strickland, Jr., former Secretary of the Interstate Commerce Commission (ICC) ("Strickland Declaration," Doc. No. 241), and Gregory Evans, counsel of record for Asarco ("Evans Declaration," Doc. No. 242), to establish that it could not readily discover abandoned railroad ownership until after the lawsuit was filed in May of 2011 due to Union Pacific's failure to file required public documents. (Doc. No. 239 at 20-21) Mr. Strickland describes his knowledge and experience with ICC abandonment filing requirements; Mr. Evans sets out a detailed factual narrative primarily regarding Asarco's efforts to identify the ownership of abandoned rail lines in SEMO. Union Pacific requests the Court strike both declarations as untimely under Rule 37(c)(1) and the Evans declaration as improper attorney testimony. (Doc. No. 248 at 3) Asarco argues that neither declaration was required to be disclosed under the MCMO or Rule 26(a)(1) since they were offered not in support of Asarco's Lone Pine showing,

but rather in opposition to Union Pacific's statute of limitations affirmative defense. (Doc. No. 251 at 1-2)

Rule 56(c)(4) requires that affidavits used to support or oppose a motion for summary judgment be based on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. It is the Court's job to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record. <u>Snider v. City of Cape Girardeau</u>, 2011 WL 6331775, at *1 (E.D. Mo. Dec. 19, 2011) (citation omitted). Motions to strike are usually granted only in circumstances where the contested evidence causes prejudice to the moving party. <u>Id</u>. Because Union Pacific has not identified any prejudice arising from the contents of the declarations, the motion to strike will be denied. The Court will consider Asarco's declarations to the extent they can assist the Court in determining whether there is a genuine issue of material fact on the issue of Union Pacific's notice.

## 2.    New evidence

Asarco moves to strike Union Pacific's exhibits to its reply brief in support of summary judgment (Doc. Nos. 247-1 through 247-7) arguing it has been deprived of the opportunity to respond and address fully the "new evidence" and arguments contained therein. (Doc. No. 252 at 1) Union Pacific responds that its submissions do not raise new issues or arguments; instead, they directly relate to and are designed to rebut matters raised and discussed by Asarco in its summary judgment response. (Doc. No. 271 at 2-5)[8] Asarco takes particular exception to the

---

[8] For example, Exhibit 5 (Doc. No. 247-5) is a letter to counsel for Asarco from counsel for Union Pacific dated May 27, 2014 requesting that Asarco stipulate to withdrawing its claims concerning the West Fork, Sweetwater and Glover Smelter sub-sites. In its summary judgment response, Asarco states that on June 18, 2014, its attorneys offered to withdraw its claims for the West Fork, Sweetwater and Glover subsites so that the case could focus on the areas where it could confirm Union Pacific's ownership and

pipe and wire line licenses that Union Pacific submits to establish Asarco's knowledge that Union Pacific had an active rail line in Southeast Missouri. (Doc. Nos. 247-3 and -4) Asarco argues these licenses pertain to the Glover smelter, a site no longer at issue in this case, and should be stricken. (Doc. No. 252 at 3) This argument is unavailing since the issue raised in Union Pacific's summary judgment motion concerns Asarco's knowledge of Union Pacific operations in the SEMO area overall.

In any event, Asarco's primary complaint is that it was deprived of an opportunity to respond to these "new exhibits." As discussed below, the Court granted Asarco the opportunity to conduct additional discovery and supplement its response to Union Pacific's motion, effectively mooting Asarco's objections and motion. Accordingly, Asarco's motion to strike Union Pacific's exhibits will be denied.

### B.    Undisputed facts[9]

On February 8, 2008, Asarco signed a Settlement Agreement Regarding the Southeast Missouri ("SEMO") Sites (the "SEMO Settlement"). In accordance with CERCLA § 122(i), the United States published notice of the proposed SEMO Settlement and provided the opportunity for public comment in the Federal Register on March 13, 2008 (73 Fed. Reg. 13569 (2008). On May 12, 2008, a hearing was held on Asarco's "Motion for Order Approving Settlement Agreement among ASARCO LLC, The United States, The State of Missouri, The Doe Run

---

abandonment, Madison and St. Francois counties. (See Exhibit 2 to Evans Decl. (Doc. No. 239 at 10; Doc. No. 242-2) Union Pacific states it submitted exhibit 5 with its reply to demonstrate that it was Union Pacific that first requested Asarco to withdraw its claims regarding the three sub-sites for lack of any evidentiary basis.

[9] The undisputed facts are taken from Union Pacific's Statement of Uncontroverted Material Facts in Support of Summary Judgment (Doc. No. 221 at ¶¶ 2, 7, 8, 9, 12) and Asarco's Response thereto. (Doc. No. 243)

Company, and DR Land Holdings LLC Regarding The Southeast Missouri (SEMO) Sites." On May 12, 2008, the Bankruptcy Court approved the Settlement Agreement After Public Comment for the Southeast Missouri (SEMO) Sites. On May 12, 2011, Asarco filed its original Complaint in the U.S. District Court for the Eastern District of Missouri and asserted CERCLA contribution claims against various defendants, including Burlington Northern Santa Fe Railway Company ("BNSF"). (Doc. No. 1) On September 14, 2011, Asarco filed its First Amended Complaint in the U.S. District Court for the Eastern District of Missouri, asserting a CERCLA contribution claim against Union Pacific. Asarco filed its Second Amended Complaint on February 9, 2012. (Doc. No. 78)

### C. Discussion

### 1. CERCLA statute of limitations

CERCLA § 113(g)(3)(B) establishes a three-year statute of limitations for claims arising from a settlement with the United States or a state which begins to run on the date of "entry of a judicially approved settlement with respect to such costs or damages." 42 U.S.C.A. § 9613(g). Union Pacific argues that because Asarco waited more than three years after judicial approval of its SEMO settlement to sue Union Pacific, its claim is time-barred. (Doc. No. 220 at 2-5)[10] Asarco argues that because its settlement occurred in the context of a bankruptcy, CERCLA's three-year statute of limitations was triggered on the date Asarco paid the SEMO settlement, December 9, 2009, rather than on the date the Bankruptcy Court approved it. (Doc. No. 239 at 11-14)

---

[10] Union Pacific also argues that even if Asarco's complaint is not time-barred, Asarco fails to make a prima facie showing that Union Pacific owes it contribution for three of the SEMO sites, namely the West Fork, Glover Smelter, and Sweetwater sub-sites. (Doc. No. 220 at 11-14) As noted above, Asarco stipulated that it is not pursuing its claims as to these three sub-sites located in Reynolds and Iron Counties. (Tr. at 4:20-5:24)

Courts have uniformly rejected this argument, holding in accordance with the plain statutory language of CERCLA, that where the parties have settled, the limitations clock begins running when the Bankruptcy Court approved the settlement, not on the effective date of the reorganization or when Asarco paid the settlement. See Asarco LLC v. Union Pacific R.R. Co., 755 F.3d 1183, 1189 (10th Cir. 2014) ("There is nothing in the term 'judicially approved settlement' or the text of CERCLA § 113 to indicate that there is any special or different rule which would apply in the bankruptcy context."); Asarco LLC v. Goodwin, 756 F.3d 191, 202 (2d Cir.), cert. denied, 135 S. Ct. 715, 190 L.Ed. 2d 441 (2014) ("Congress chose to tie the limitation period to the 'entry of a judicially approved settlement' and not to 'approval of [a reorganization] [p]lan.'"); ASARCO LLC v. Union Pacific R.R. Co., No. 12-cv-03216-REB-MJW, ECF No. 47 (D. Colo. Jul. 8, 2013) (unpublished); ASARCO LLC v. Atlantic Richfield Co., 2012 WL 5995662, at *2 (D. Mont. Nov. 30, 2012) ("The plain language of § 9613(g)(3)(B) contradicts Asarco's contention that the statute of limitations did not begin to run until its Reorganization Plan was either approved by the Bankruptcy Court or became effective.") (citing Asarco, LLC v. Hecla Min. Co., 2012 WL 5929962, *2 (E.D. Wash. Nov. 27, 2012) (rejecting a similar argument); Asarco LLC v. Xstrata PLC, 2013 WL 2949046, at *3-4 (D. Utah Jun. 14, 2013). The Court finds the rulings in these cases to be persuasive.

Asarco's May 12, 2008 SEMO Settlement triggered CERCLA's statute of limitations and its claim expired three years later, on May 12, 2011. Because more than three years had passed when Asarco added Union Pacific as a party on September 14, 2011, its contribution claim against Union Pacific is time-barred.

**2.      Relation back doctrine**

In order to avoid a statute of limitations bar, Asarco's amended complaint must satisfy the requirements of Rule 15(c) and relate back to the date its original complaint was filed. An amended complaint will relate back only if the party being added has received "such notice of the action that it will not be prejudiced in defending on the merits" within 120 days of the filing of the original complaint, and knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against it. Fed. R. Civ. P. 15(c)(1)(C)(i), (ii); Fed.R.Civ.P. 4(m); Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 541 (2010). Whether an amended pleading should be allowed and whether it relates back to the date of the original pleading are matters within the sound discretion of the trial court. Shea v. Esensten, 208 F.3d 712, 720 (8th Cir. 2000).

Notice is the "linchpin" of a Rule 15(c) determination. Schiavone v. Fortune, 477 U.S. 21, 31 (1986). Some courts require evidence of actual notice of the action filed while others have ruled that constructive notice may suffice. 3 Moore's Federal Practice, §15.19[3][c] (Matthew Bender 3 ed.).[11] "The pertinent question is whether or not the new party, when viewed from the standpoint of a reasonably prudent person, should have expected that the original pleading might be altered or called into question." Lacedra v. Donald W. Wyatt Detention Facility, 334 F.Supp.2d 114, 129 (D.R.I. 2004) (citing Manney v. Monroe, 151 F.Supp.2d 976, 995 (N.D.Ill.2001); 6A Wright, et al., Federal Practice and Procedure § 1497 at 93 (noting that the reasonable person inquiry better reflects the liberal policy of Rule 15(c)).

---

[11] Federal courts have found sufficient notice for purposes of the relation-back doctrine in at least four different factual situations. Cholopy v. City of Providence, 228 F.R.D. 412, 416 (D.R.I. 2005). First, there is sufficient notice when an employee authorized to receive a summons does not reject a summons naming a non-existent party. Id. (citing Pineda v. Almacenes Pitusa, Inc., 982 F.Supp. 88, 97 (D.Puerto Rico 1997) (serving a secretary authorized to receive summonses imputed knowledge to her employer that the original complaint was directed against the employer rather than a non-existent entity)). Second, there may be constructive notice if the original complaint alleges that the new defendant committed the

Union Pacific argues that Asarco's claims do not relate back to the filing of the original complaint because it had no notice that it would have been sued but for Asarco's mistake. (Doc. No. 220 at 6) Asarco never identified any claim against Union Pacific at SEMO in any of its bankruptcy filings, and no regulatory authority identified Union Pacific as a liable party at the SEMO sites. (Id. at 6-7) Union Pacific distinguishes its circumstances from the typical relation-back case where a petition is filed mistakenly against the wrong corporate entity; here, no Union Pacific-related entity was sued. (Id. at 7)

Union Pacific further argues that Asarco had actual knowledge of Union Pacific's potential liability at SEMO when it filed its original complaint based on the NewFields Report, which identified railroads that may have contributed to environmental conditions in SEMO. (Id. at 8) In addition, Asarco's corporate witness, John Pfahl, testified that by the time Asarco filed the original complaint on May 12, 2011, it "had enough information to believe that railroads owned and operated in the area could have potential liability for the SEMO sites." (Deposition of John Christopher Pfahl ("Pfahl depo."), Doc. No. 256-2 at 132:6-21) Indeed, Asarco named BNSF Railway Company ("BNSF") as a defendant in the original complaint. (Doc. No. 220 at 8-

---

illegal acts described therein and is an official of one of the original defendants. Id. (citing Daily v. Monte, 26 F.Supp.2d 984, 987 (D.Mich.1998) (citations omitted)). Third, a new defendant may have constructive notice if he or she retains the same attorney as an original defendant and that attorney should have known that the new defendant would be added to the existing lawsuit. Id. (citations omitted). Finally, a court may find constructive notice when the original and newly added defendants share an "identity of interests," i.e., when they are "so closely related in business or other activities and their interests are sufficiently aligned that it is fair to presume that the new defendant leaned of the institution of the action from the original defendants." Id. at 417 (citing Ayala Serrano v. Lebron Gonzalez, 909 F.2d 8, 12 (1st Cir. 1990); Bowden v. Wal-Mart Stores, Inc., 124 F.Supp.2d 1228, 1241-42 (M.D.Ala.2000); 6A Wright, et al., supra, § 1498 at 146). See also Anno., "Sufficiency of notice or knowledge required under Rule 15(c)(1)(2) of Federal Rules of Civil Procedure dealing with relation back of amendments changing parties against whom claim is asserted," 11 A.L.R.Fed. 269 (1972, Cum.Supp.). None of these factual situations are presented in this case.

9) For this reason, Union Pacific maintains that Asarco is not entitled to equitable tolling. (Id. at 9-10)

Asarco argues that by monitoring Asarco's bankruptcy proceedings and attending the public hearings regarding the SEMO settlement conducted in St. Louis, Union Pacific knew or should have known that it should be named in Asarco's original complaint but for Asarco's mistake as to the identity of the successor to the historic owners and operators of the SEMO rail lines. (Doc. No. 239 at 17-21) According to Asarco, it did not include Union Pacific in its original complaint because "Union Pacific concealed - through a series of complicated and confusing corporate maneuvers – from the United States and others that it purchased, possessed and abandoned contaminated rail lines in SEMO." (Id. at 14, 17) Because it was unable to identify Union Pacific as the proper defendant for the rail lines liability at SEMO until after the statute of limitations had run, Asarco maintains it is entitled to equitable tolling. (Id. at 22)

Asarco also argued, both in its briefing and at the hearing, that it had not had an adequate opportunity to develop evidence related to Union Pacific's statute of limitations affirmative defense, particularly on the issue of notice. (Doc. No. 239 at 17 n.4, 18 n.6; Tr. at 20:17-22:11) Given the MCMO limiting discovery to Asarco's CERCLA liability claim, the Court permitted Asarco to conduct a Rule 30(b)(6) deposition on the limited issue of Union Pacific's notice of Asarco's CERCLA contribution claims at the SEMO sites and to supplement its response to Union Pacific's motion for summary judgment. (Doc. No. 288) Union Pacific produced Robert M. Grimaila, Vice-President of Safety, Security and Environment, as its designated witness. The sole topic of Mr. Grimaila's deposition was Union Pacific's notice of Asarco's CERCLA contribution claims at the SEMO Sites. (Doc. No. 294-3)

In its supplemental response, Asarco contends that the notice required under the "relaxed standard" of Rule 15(c)(1)(C) is established through two key communications:

1. A May 16, 2011 e-mail to Union Pacific from outside counsel forwarding an article on Law360, reporting that Asarco had sued BNSF for recovery of the $80 million Asarco paid to remediate SEMO, and

2. A July 20, 2011 "claim" letter notifying Union Pacific that Asarco had CERCLA contribution claims against Union Pacific at numerous sites including SEMO and seeking Union Pacific's participation in mediation "in order to avoid the need to add Union Pacific to existing litigation."

(Doc. No. 293 at 14) Union Pacific replies that it did not have actual or constructive notice of the action within the meaning of Rule 15(c) until it was served with the first amended complaint. (Doc. No. 296 at 12-14)

Asarco provides no support for its contention that a news report of a CERCLA contribution action against BNSF constitutes sufficient notice of an intended lawsuit against Union Pacific for purposes of Rule 15(c). Upon review there is nothing in the article to suggest that Union Pacific was an intended party.

Further, Asarco's July 20, 2011 letter, listing ten sites nationally and stating that "litigation is pending at some of these sites" (see Doc. No. 294-5), does not constitute notice to Union Pacific that Asarco intended to sue Union Pacific in its original complaint but failed to do so by "mistake." Indeed, as Union Pacific points out, the letter actually demonstrates that even before that date, Asarco believed it had a claim in the SEMO suit against Union Pacific but chose not to file. (Doc. No. 247 at 9) In subsequent correspondence dated August 26, 2011, Union Pacific specifically referenced mediation addressing one site in particular, the Omaha Lead Site (OLS), and requested Asarco provide all information it was relying on regarding additional sites it believed Union Pacific had any responsibility for. (See Doc. No. 294-7) The fact that Union

Pacific was participating in proceedings concerning another site does not equate to notice that Asarco intended to sue Union Pacific in its original complaint at SEMO. Moreover, the threat of an impending lawsuit does not satisfy the notice requirement of Rule 15(c). See Schrader v. Royal Caribbean Cruise Line, Inc., 952 F.2d 1008, 1012-13 (8th Cir. 1991), holding that plaintiff's letter stating her intent to sue unless her claim could be settled failed to constitute "notice." See also, Brown v. E.W. Bliss Co., 818 F.2d 1405 (8th Cir. 1987), holding that even though the plaintiff and the proper defendant's agent carried on settlement negotiations within the limitations period, the plaintiff still had not given timely Rule 15(c) notice. Id. at 1409, 1411.

This is not a case where a plaintiff sued the wrong party. Here, Asarco clearly knew before the expiration of the statute of limitations that Union Pacific operated in SEMO, despite the complicated history of rail ownership in the area. Asarco's knowledge of Union Pacific operations in the SEMO area is evidenced by two license agreements it entered into with Union Pacific to allow access over the active DeSoto Subdivision line at Glover in Iron County (Doc. Nos. 247-3, -4), as well as by the presence of Union Pacific's four active rail lines in St. Francois and Iron Counties. See Krupski, 560 U.S. at 548 (Information in the plaintiff's possession is relevant to the relation back inquiry if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity.). The Eighth Circuit has ruled that the relation back doctrine does not authorize relation back of an amended complaint without timely notice, even if the correct defendant is difficult to identify. See Brown, 818 F.2d 1405 (no relation back despite evidence that the defendant corporations' agents had misled the plaintiff about the name of the corporation they represented).

Lastly, Asarco has failed to raise any grounds for the equitable tolling of the limitations period. The doctrine of equitable tolling "permits a plaintiff to sue after the statutory time period

has expired if he has been prevented from doing so due to inequitable circumstances." <u>Firstcom,</u> <u>Inc. v. Qwest Corp.</u>, 555 F.3d 669, 675 (8th Cir.2009) (quoting <u>Pecoraro v. Diocese of Rapid</u> <u>City</u>, 435 F.3d 870, 875 (8th Cir.2006)). But equitable tolling offers "an exceedingly narrow window of relief" and courts "rarely invoke doctrines such as equitable tolling to alleviate a plaintiff from a loss of his right to assert a claim." <u>Id</u>. (internal quotation marks omitted). A party seeking equitable tolling bears the burden of showing "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." <u>Johnson v. Hobbs</u>, 678 F.3d 607, 610 (8th Cir.2012) (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)).

Asarco cannot show that any extraordinary circumstances prevented it from filing its CERCLA contribution claim against Union Pacific within the limitations period expired. Asarco contends it was unable to identify Union Pacific as a defendant because Union Pacific concealed, "through a series of complicated and confusing corporate maneuvers," the fact that it purchased, possessed and abandoned rail lines in SEMO. Even if this were true, however, there is no indication that such actions interfered with Asarco's *awareness* of its potential claim. <u>See</u>, <u>e.g.</u>, <u>Harrison v. Harlem Hosp.</u>, 2007 WL 2822231, at *3 (S.D.N.Y. Sept. 28, 2007) (tolling of statute of limitations not warranted; "alleged concealment did not, in fact, deprive Plaintiffs of information needed to file a lawsuit"). As discussed herein, Asarco had all the information it needed to file its CERCLA contribution claim against Union Pacific within the limitations period. The NewFields Report identified railroads that may have contributed to the environmental conditions in SEMO. Asarco's corporate witness acknowledged that by the time it filed its original complaint on May 12, 2011, Asarco had enough information to believe that

railroads owned and operated in the area could have potential liability for the SEMO sites. In fact, Asarco named BNSF as a defendant in its original complaint.

Moreover, this case is not one in which the equities favor applying the doctrine of equitable tolling. Asarco represented to the Bankruptcy Court that its SEMO settlement was for its fair and reasonable share of the costs and damages associated with the site. (Doc. No. 102-2) It did not identify any claim or potential claim against any potentially responsible party for SEMO in its disclosures of assets and liabilities filed in the Bankruptcy Court. (Doc. No. 102-16) Once its settlement was approved by the Bankruptcy Court, Asarco set out to identify parties from whom it could seek contribution. Asarco had over three years to assert a claim against Union Pacific, which it failed to do. "The doctrine of equitable tolling is not intended to rescue claims in these circumstances. Rather, application of the doctrine is an exercise of a court's equity powers and is intended for situations that "demand equitable intervention" to correct particular injustices." Kost v. Hunt, 983 F. Supp. 2d 1121, 1130 (D. Minn. 2013) (citing Holland v. Florida, 560 U.S. 631 (2010); Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1330 (8th Cir.1995) (noting that application of the doctrine requires a "case-by-case analysis," a "balancing of the equities," and application "only in exceptional circumstances").

**Conclusion**

For these reasons, the Court concludes that Asarco's amended complaint does not meet the requirements of Rule 15(c). Therefore, its amendment does not relate back to the filing of its original complaint and does not avoid the three year time bar set by CERCLA. The statute of limitations ran on May 12, 2011, four months before Asarco filed its first amended complaint adding Union Pacific as a party. Union Pacific's motion for summary judgment will, therefore, be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Union Pacific's Motion for Summary Judgment [220] is **GRANTED**. Judgment on Plaintiff Asarco's Second Amended Complaint is entered in favor of Defendant Union Pacific and against Plaintiff Asarco.

**IT IS FURTHER ORDERED** that Asarco's Motion to Exclude Opinions of Union Pacific's Expert Roy P. Farwell [222] is **DENIED**.

**IT IS FURTHER ORDERED** that Union Pacific's Motion to Exclude Expert Opinions and Testimony of Asarco's Expert [224] is **DENIED**.

**IT IS FURTHER ORDERED** that Union Pacific's Motion to Strike the Declarations of Sidney L. Strickland and Gregory Evans [248] is **DENIED**.

**IT IS FURTHER ORDERED** that Asarco's Motion to Strike New Evidence submitted by Union Pacific in its Summary Judgment Reply Brief [252] is **DENIED**.

**IT IS FURTHER ORDERED** that Asarco's Motion to Strike Union Pacific's Exhibits and Summaries of Evidence [266] is **DENIED**.

**IT IS FURTHER ORDERED** that Union Pacific's Motion for Leave to file its Demonstrative Exhibits in advance of the Lone Pine Hearing [272] is **GRANTED**.

A separate Judgment will accompany this Memorandum and Order.

Dated this 22nd day of May, 2015.

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**